**U. S. EXPANSION BOLT COMPANY,**
**Appellant,**

**v.**

**JORDAN INDUSTRIES, INC., et al.**

**No. 72–1896.**

United States Court of Appeals,
Third Circuit.

Argued Sept. 4, 1973.

Decided Dec. 3, 1973.

D'Agui & Del Collo, Philadelphia, Pa., for appellant; Samuel J. Stoll, and Robert S. Stoll, New York City, of counsel.

Alan H. Bernstein, Caesar, Rivise, Bernstein & Cohen, Philadelphia, Pa., for appellees.

Before HASTIE, VAN DUSEN and GIBBONS, Circuit Judges.

OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

█ This is an appeal from a judgment in favor of defendants-appellees in a patent infringement action in which plaintiff-appellant's patent, U.S. Patent

No. 3,022,701, was adjudged invalid as being reasonably obvious to one with ordinary skill in the art at the time of invention, within the meaning of 35 U.S.C. § 103.[1] Because the district court found it unnecessary to decide the issue of infringement, the sole issue on appeal is whether the district court erred in holding plaintiff-appellant's patent invalid on the ground of obviousness.[2] Although the facts of this case present a close question on this issue under 35 U. S.C. § 103, after careful consideration of the record and the district court opinion, we affirm the judgment of the district court.

I.

The patent in question relates to an anchor-type wall fastener composed of an anchor and an expanding member. Since both parties adopted the district court's description of the patented device for purposes of the appeal, we repeat that description:

"The [invention of the] patent in suit is a wall fastener composed of an anchor and an expanding member, sold commercially as the 'Tap-It' fastener. These fastening type devices are commonly used where conventional fasteners such as a nail or screw without anchor cannot be utilized because of the composition and physical characteristics of the wall to which the object will be attached. As stated in the patent, such wall materials would include concrete, cinder block, brick, plaster, stone, marble, composition board and others. The basic principle by which anchor type fasteners operate is not complicated. After a hole is drilled in the material, the anchor when placed in the hole is wedged in as it is expanded by a nail, screw or other member driven into it. The friction against the sides of the hole keeps the anchor in the wall, thus ena-

1. The opinion of the district court is reported at 346 F.Supp. 541 (E.D.Pa.1972).

2. In addition to the defenses of obviousness and non-infringement, the defendants con-

tended at trial that the patent was unenforceable because the plaintiff was guilty of laches. The district court rejected this contention, 346 F.Supp. at 541–542, and we agree.

bling an object to be fastened to a wall otherwise unsuited for such purposes.

"The expandable anchor of plaintiff's patent is molded of plastic having the general properties of nylon. It generally has a cylindrical configuration with a head which does not enter the hole. At the headed end there is a longitudinal hole to receive the driven expanding member, with the other end having a longitudinal slot aligned with that hole and extending to it. The slot separates a pair of flexible portions. They are forced outwardly as the member is driven through the slot because of the fact that the slot has a smaller diameter than the shank of the expanding member. The expanding member part of this patent has a substantially cylindrical shank with a pointed tip adapted for wedging action as in the conventional nail. It can most aptly be described as a 'screw-nail', however, because unlike the conventional nail, only the bottom half of the shank is smooth. The top of this 'screw-nail' has a screw-type head with a slot for a screwdriver, and next to this headed end shallow screw threads with rounded edges which terminate about midway on the length of the shank.

"The patent states that the 'screw-nail' may be hammer driven in a translatory motion (longitudinal, non-rotational). It is not rotated into the anchor with its threads cutting into the anchor wall. Instead, after being hammer driven, the nylon material of the anchor cold flows into the spaces between the threads to form transitory screw threads in the anchor wall. This member, because of its slotted screw-type head may be screwed out of the anchor by screwdriver means. Since Nylon has a relatively retentive memory, once the 'screw-nail' is withdrawn from its wedging engagement the anchor will tend to resume its

original form and proportions and will, therefore, be reusable."

346 F.Supp. at 542–543.

## II.

The standard of obviousness as a ground of patent invalidity is set forth in 35 U.S.C. § 103, which provides:

"A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject-matter pertains."

In Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966), the Supreme Court definitively construed section 103 and established the primary tests for determining whether a patent was obvious at the time of invention:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved."

See also Anderson's-Black Rock v. Pavement Salvage Co., 396 U.S. 57, 62, 90 S. Ct. 305, 308, 24 L.Ed.2d 258 (1969). We have examined both the record and the district court opinion and have concluded that the district court properly applied the above primary tests and that the district court's findings of fact are not clearly erroneous.

■ With respect to the scope and content of the prior art,[3] plaintiff does not contend that the nylon anchor was a new invention at the time of the patent application. The Patent Office recognized among the prior art two foreign wall anchor patents disclosing anchors which were made of a plastic material such as nylon. Swiss Patent No. 311,726 (1956); French Patent No. 1–

3. The prior art must be evaluated as of August 10, 1959, the time of the invention (the date of the patent application), in making the determination of obviousness.

122,536 (1956). Moreover, plaintiff stipulated at trial that the nylon anchor used in the patent in suit, both by itself and in conjunction with a plain nail, is prior art against the patent in suit.

■ Thus, as the district court properly noted, the validity of plaintiff's patent hinges on the question whether plaintiff's "screw-nail" used in combination with a known nylon anchor is obvious or not. Since the defendants came forward with significant prior art not considered by the Patent Office, the presumption of validity attaching to plaintiff's patent in this case [4] is weakened. Hadco Products, Inc. v. Walter Kidde, 462 F.2d 1265, 1272 n.33 (3d Cir. 1972).

The plaintiff contends that there are three significant differences between the screw-nail expander described in its patent and the anchor expanders taught in the prior art. First, plaintiff claims that the prior art does not show an expansion anchor expanded by a hammer-driven screw means of any kind. Second, plaintiff contends that the prior art does not show a screw-nail—used either in combination with an expansion anchor or by itself—having a non-tapered, non-threaded shank at its lower end. Finally, and most significantly, plaintiff claims that the prior art does not show a screw-nail having rounded threads. We will consider each of these differences to combine the advantageous features of *seriatim*.

With respect to the first difference, the prior art clearly evidences attempts to combine the advantageous features of a screw and a nail. In fact, the primary advantages of a hammer-driven screw-nail—greater holding power, easy removability, and reusability—were taught by the prior art over a century ago.[5] The district court examined the prior art in detail [6] and concluded that plaintiff's adaptation of the advantages of the hammer-driven screw-nail for use in an expansion anchor [7] would be obvious to one skilled in the art:

"We find . . . that the level of ordinary skill in the pertinent art is that of the ordinary mechanic or tradesman, there thus being familiarity with screw nails used for a variety of purposes. It is apparent that one skilled in the art could very well decide to use any known screw nail with a known anchor."

346 F.Supp. at 544.

We concur with the district court's conclusion that an ordinary mechanic or tradesman could very well decide to use any known screw-nail with a known anchor. The precise characteristics and advantages of the hammer-driven screw-nail had been clearly established in the prior art, and there was nothing to indicate that these advantages would not automatically accrue to the use of the screw-nail in combination with a nylon expansion anchor.

The second difference claimed by the plaintiff—the use of a screw-nail having a non-tapered, non-threaded shank at its lower end—is concededly shown nowhere in the prior art. However, the prior art

4. Normally, the starting point in analyzing a challenge to a patent's validity is the presumption that the patent is valid, with the burden of proof resting on the party asserting invalidity. 35 U.S.C. § 282. See Trio Process Corporation v. L. Goldstein's Sons, Inc., 461 F.2d 66, 70 (3d Cir. 1972).

5. Pratt Patent No. 10,171 (1853); Dunn Patent No. 83,699 (1868); Fetter Patent No. 8,121 (1878); British Wells Patent No. 8323 (1888). These patents did not teach use of the screw-nail with an expansion fastener.

6. 356 F.Supp. at 544.

7. Plaintiff's patent was not the first patent to show use of a screw-nail with an expansion anchor. Lee Patent No. 1,865,866 (1932) discloses a "screw-nail" threaded for approximately 25% of the shank down from the head, which is intended to be used as an expanding member in a fastening device. Unlike the screw-nail in this suit, however, it was not intended to be completely hammer-driven. The Lee nail teaches hammering it in to the point where one thread is embedded, with the member then being screwed into place with a screwdriver, utilizing its sharp threads.

does show (1) an 'entirely threaded screw-nail with only a slightly tapered shank,[8] (2) a partially threaded screw-nail tapered at the lower end,[9] and (3) a non-threaded (plain), cylindrical nail used in combination with an expansion anchor.[10] Plaintiff contends that the cylindrical feature of its screw-nail constitutes an extremely significant and patentable advance over the prior art since the non-tapered effect creates greater wedging action and, hence, greater fastening strength. We reject this contention since we believe that the use of a cylindrical screw-nail which would not only create greater wedging action but also preserve the distinct advantages of a screw-nail in general would have been obvious to one skilled in the art. A mechanic or tradesman would easily recognize that a screw-nail with no taper would maximize the utility of the nylon fastener.

The final difference claimed by the plaintiff—the rounding of the screw threads—proves most troublesome in resolving the issue of obviousness. Plaintiff argues that there is a crucial difference between sharp and rounded threads when used with anchors consisting of nylon or other plastic material. This difference results primarily from the property of nylon anchors known as "cold flow." Normal screw-nails (such as the British Wells Patent and the Lee Patent) appear to have sharp cutting threads so that they can cut threads ro-

tationally in the material in which they are driven. In anchors composed of non-cold flow material, such as wood, this effect is necessary to attain maximum gripping action. However, this effect is not only unnecessary in cold flow anchors, but in fact it may tend to undermine the fastening strength of the cold flow anchor. The district court found the following in this regard:

> "The hammering of a screw with sharp threads into such an anchor would not only seriously damage the anchor but would reduce the tensile strength that would be present from the threading action if the screw was screwed in with a screw driver. . . . The screwing of a sheet metal screw or another screw with sharp threads would cut threads in the inner wall of the anchor leaving no space for cold flow between the routes of the threads of the screw and the wall. The anchor of course would not be reusable."

346 F.Supp. at 544.

Thus, the screw-nail with rounded threads achieves an effect not achieved in the prior art. Unlike the sharp threaded screw-nail, the round threaded screw-nail does not ream the inner wall of the anchor; instead, the inner wall of the anchor cold flows around the rounded threads, forming complementary, transitory threads which disappear when the screw-nail is removed and rendering the anchor reusable.[11]

---

8. Pratt Patent No. 10,171 (1853). In addition, the screw-nail of Fetter Patent No. 8,121 (1878) has only a very slight taper and is almost entirely threaded, having a small unthreaded portion at the top of the shank. Fetter Patent No. 8,121 (1878). See Transcript at 5–50 to 5–52. See also J. Soled, Fasteners Handbook 72 (1957).

9. British Wells Patent No. 8323 (1888); Lee Patent No. 477,810 (1930). The Lee Patent showed a tapered, partially threaded screw-nail used in combination with an expansion anchor.

10. The plaintiff stipulated at trial that its nylon anchor used in combination with a plain cylindrical nail, as demonstrated by

Exhibit 14, was prior art. See Transcript at 1–31 to 1–32; Exhibit 14.

11. It is not clear at all that a nylon anchor used with a sharp threaded screw-nail is not reusable. The defendants demonstrated at trial with tests #8 and #10 of Defendants' Exhibit No. 19 that a nylon anchor will perform satisfactorily with a sheet metal screw having sharp cutting threads and that the combination of the nylon anchor and the sheet screw is reusable. In test #8, the sheet metal screw was driven into the nylon anchor with a hammer and removed with a screwdriver five times. See Transcript at 4–37 to 4–39. In test #10, the same process was repeated three times. See Tran-

Despite this modification over the prior art, the district court held that the rounding of the threads to achieve internal cold flow would be obvious to an ordinary tradesman having skill in the art:

"Because of the nylon anchors' property of cold flow, sharp thread-cutting threads are not necessary with such an anchor, and plaintiff has rounded its screw threads to take maximum advantage of this property. We do not think this is enough, however, to render the patent non-obvious. While the precise screw-nail does not appear in the prior art, such a slight modification as the rounding of the screw thread of a nail of otherwise known configuration would be obvious to an ordinary tradesman having ordinary skill in the art. Not only was the nylon anchor not new, but its characteristic of cold flow with its advantages of an improved grip resistant to loosening due to shock and vibration was also known. J. Soled, *Fasteners Handbook* 387 (1957)."

346 F.Supp. at 544–545.

We concur with the district court's conclusion. The nylon anchor's property of cold flow was well established in the prior art,[12] and we believe that the plaintiff's maximization of the advantages of this property by rounding the threads would be obvious to one skilled in the art.

The plaintiff would have us draw a distinction between outward cold flow (i. e., cold flow into the pores of the material into which the anchor is driven) and inward cold flow (i. e., cold flow around the rounded threads of the screw-nail to form complementary transitory threads on the inside wall of the anchor). The plaintiff urges that its modification is a patentable contribution to the art because the prior art nowhere teaches the use of inward cold flow. We do not believe that this distinction compels a finding of non-obviousness. In reaching this conclusion, we note that the art of fasteners, particularly nails and screws, is a very ancient and well-developed art which has witnessed an almost infinite variety of modifications. While we do not imply that no room remains in the crowded art of fasteners for patentable contributions, we believe simply under the facts of this case that a mechanic or tradesman having ordinary skill in the art would be fully aware of the nylon anchor's property of cold flow and would realize that a rounding of the screw-nail's threads would result in a maximum utilization of this property.

The plaintiff apparently contends that, instead of analyzing the obviousness of the differences between the patent in suit and the prior art *seriatim,* the district court should have considered whether the patent in suit constitutes a "combination" patent having a "synergistic effect." In Anderson's-Black Rock v. Pavement Salvage Co., 396 U.S. 57, 61, 90 S.Ct. 305, 308, 24 L.Ed.2d 258 (1969), the Supreme Court stated that a patent may be valid on non-obviousness grounds where it creates a synergistic effect, one in which the "combination of elements . . . results in an effect greater than the sum of the several effects taken separately." See also Hadco Products, Inc. v. Walter Kidde & Co., 462 F.2d 1265, 1269–1270 (3d Cir. 1972). The Supreme Court has also admonished courts, however, to "scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950). We

---

script at 4–40 to 4–41. These tests tend to indicate that the nylon anchor, rather than the expanding member, is most responsible for the fastener's effectiveness. See note 13, infra.

12. Fasteners Handbook contained the following description of the nylon anchor's property of cold flow: "As the plastic is expanded into the hole surface, it cold flows into the pores of the material to develop an improved grip." J. Soled, Fasteners Handbook 387 (1957).

do not believe that the patent in suit creates a synergistic effect. The combination in the plaintiff's screw-nail of the elements known in the prior art results simply in an effect which represents no more than the sum of the several effects taken separately. For example, the partial threading of the shank facilitates removability and allows reuse of the screw-nail, the cylindrical shape of the shank creates greater wedging action, and the rounding of the screw threads enables the formation of transitory screw threads and allows reuse of the nylon anchor. The screw-nail—nylon anchor combination reflects no other effect which is greater than or substantially different from the aforementioned individual effects which we have held to be obvious to one having ordinary skill in the art.

As a final matter, the plaintiff emphasizes that its patented fastener has enjoyed tremendous commercial success in the trucking industry and that to a large extent in recent years it has been preferred over fasteners previously used in that industry. The Supreme Court has stated that secondary considerations, such as commercial success and the fulfillment of long-felt need, may be relevant as indicia of obviousness. Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L. Ed.2d 545 (1966). However, these factors are entitled to only measured weight, as the Supreme Court recently indicated in a decision finding a combination patent invalid on obviousness grounds despite the fact that it enjoyed commercial success.[13] Anderson's-Black Rock v. Pavement Salvage Co., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969).

The judgment of the district court will be affirmed.

---

13. The district court noted that the commercial success of plaintiff's fastener in the trucking industry may in large part result from the nylon composition of the anchor component and not from any modification reflected in plaintiff's screw-nail. The district court stated:

"[The nylon anchor] is preferable to a hard anchor because of the resilient qualities of the nylon which enable plaintiff's anchor to respond better to vibrations caused while riding over roads while a less resilient anchor might back out because of vibrations. This only reinforces our view that plaintiff's fastener combination is effective principally because of the nylon anchor and its properties."
346 F.Supp. at 545.