The **BLACK AND DECKER MANUFACTURING COMPANY, Plaintiff,**

v.

**DISSTON, INC., Defendant.**

**Civ. A. No. 74–1155.**

United States District Court,
W. D. Pennsylvania.

Aug. 11, 1977.

Arland T. Stein, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Don K. Harness, Michael R. Dinnin, Harness, Dickey & Pierce, Birmingham, Mich., for plaintiff.

Robert B. Sommer, Kirkpatrick, Lockhart, Johnson and Hutchison, Pittsburgh, Pa., John D. Nies, Strauch, Nolan, Neale, Nies & Kurz, Arlington, Va., for defendant.

## OPINION

JOHN L. MILLER, District Judge.

This patent infringement suit brought by the Black and Decker Manufacturing Company against Disston, Inc. principally involves the manufacture and sale of cordless electric hedge trimmers. Black and Decker claims that Disston is guilty of infringing its Patent No. 3,757,194 issued on September

ber 4, 1973. The thrust of Disston's defense is that the subject patent is invalid for obviousness. At the outset we note that this case, by patent litigation standards, is not that complicated. That factor we believe will facilitate the understanding of our approach to its resolution. We now turn to a brief recitation of the facts, some of which are not in dispute,[1] which we find to be as follows:

### Facts

Black and Decker is a Maryland corporation having a principal place of business at Towson, Maryland. Disston is a Delaware corporation having a principal place of business in Pittsburgh, Pennsylvania.

United States Patent No. 3,757,194[2] issued to Black and Decker, as assignee of E. J. Weber and T. G. Pugh (inventors), on September 4, 1973, and plaintiff is now and has been since that time the owner of the legal title of said patent (hereinafter the '194 patent). Black and Decker's Model 8184 cordless electric hedge trimmer is the commercial product described in this patent. The patent states eighteen claims. Black and Decker has reduced considerably the magnitude of this suit by asserting that Disston is breaching but two of those claims. We are concerned only with Claims 1 and 3 of the '194 patent which read as follows:

### Claim 1

A power operated shrub or hedge trimmer comprising a housing having an electric motor disposed in the forward end thereof, a blade assembly extending forwardly from the lower end of said housing and driven by said motor through a transmission below said motor, said housing having a lower, rearward part cut away to form an outwardly opening recess, an electric power unit constructed to slidably fit within said recess and having such an external configuration that when it is fully within the recess its external walls form continuations of the external

---

1. *See* Stipulated Facts For Trial filed August 30, 1976.

2. Plaintiff's Exhibit (PX) No. 1. Defendant's exhibit shall be referred to as "DX".

walls of said housing adjacent said recess, cooperating electrical connector means on said power unit and said housing for electrically powering said motor when said power unit is fully in place within said housing, a transverse recess in the upper rearward part of said housing, forming above it a first handle extending longitudinally of said housing, to be grasped by one hand of a user, and a second handle positioned forwardly of said recess and being inverted U-shaped in configuration whereby its cross piece is above said housing to be grasped by the other hand of said user, said motor, said transmission, and said power unit being disposed for good balance of said tool when handled by said user.

### Claim 3

A power operated tool according to claim 1, in which said power unit contains batteries.[3]

Disston has, preceding the filing of the complaint herein and subsequent to the issuance of said '194 patent on September 4, 1973, sold within the Western District of Pennsylvania and elsewhere in the United States the following accused products:

| | |
|---|---|
| Disston CEHT–3 cordless electric hedge trimmer (Version A—with mechanical latch) | (PX No. 5A) |
| Disston CEHT–3 cordless electric hedge trimmer (Version B—with mechanical detent) | (PX No. 5B) |
| Disston CEHT–4 cordless electric hedge trimmer (Version A—with mechanical latch) | (PX No. 6A) |
| Disston CEHT–4 cordless electric hedge trimmer (Version B—with mechanical detent) | (PX No. 6B) |
| Disston Model 800 cordless electric hedge trimmer | (PX No. 7) |

Defendant has also, preceding the filing of the second amended complaint herein, and subsequent to the issuance of said '194 patent on September 4, 1973, manufactured and sold the accused product known as:

| | |
|---|---|
| Disston Model 1030 Powerpack cordless electric hedge trimmer. | (PX No. 10) |

---

**3.** This claim is written in dependent form and shall therefore be construed to include all the limitations of Claim 1. 35 U.S.C. § 112 (1970 Ed. Supp. V 1975).

**4.** DX No. 1, tab 5.

**5.** Transcript (Tr.) of proceedings held November 8, 9 and 10, 1976, 125.

Because Black and Decker had marketed another cordless electric hedge trimmer as early as 1962 under a prior patent, the Riley Patent (No. 3,212,188[4]), and because the Riley hedge trimmer (PX No. 71)—novel as it was—did not achieve commercial success, management ordered that improvements be sought. Accordingly Black and Decker's engineer-inventors, Weber and Pugh, began work on the Model 8184 project in the summer or fall of 1970.[5] They were principally charged with the task of devising a more practical—i. e., lighter, yet powerful, and easier to use—cordless hedge trimmer that could be manufactured at a reasonable cost. While the parties appeared during the trial to strongly dispute the point in time at which the true idea which spawned the invention was conceived, we find that December of 1970 denotes the proper time reference.[6] We further observe that plaintiff now directs its arguments to the pertinency, not the timeliness, of defendant's prior art assertions.

Because the issue of "obviousness" turns on the relevant prior art we now review the facts pertinent to that issue.

The scope and content of the prior art is demonstrated by a compilation of patents[7] and certain physical devices introduced into evidence by Disston. The devices are:

| | | |
|---|---|---|
| 1) | Disston EGS–1 grass shear; | (DX No. 18) |
| 2) | Disston CEHT–1 hedge trimmer; | (PX No. 74) |
| 3) | Sony Recorder TC–110 and owner's manual; | (DX Nos. 45, 46) |
| 4) | Sony Recorder TC–40 and owner's manual; | (DX Nos. 47, 48) |
| 5) | Rush Walkie-Talkie; | (DX Nos. 10, 10A) |
| 6) | Hotchkiss Otoscope; | (DX Nos. 13, 14, 15) |
| 7) | Riley Black and Decker Hedge Trimmer as disclosed in Patent No. 3,212,188. | [PX No. 71 (device) DX No. 1, tab 5 (patent)] |

---

**6.** The slideout battery pack configuration and adjacent housing—singularly, the most significant advancement—was conceived in the winter of 1970. Tr. 413–14; Invention disclosure 71–1757 states the date of December 3, 1970. PX No. 21.

**7.** Defendant's Exhibit (DX) No. 1.

Of the patents and devices mentioned above only Patents 3,186,878 (DX No. 1, tab 4) (Filander release latch) and 3,212,188 (DX No. 1, tab 5) (Riley cordless hedge trimmer) were considered by the Patent Office.[8] This is not to say that the Patent Examiner considered very little prior art in granting the Weber and Pugh patent. Actually the Patent Examiner considered in excess of twenty pertinent patents, some of which were referred to him by plaintiff's patent counsel.[9]

We find however as a matter of fact that the prior art proffered by Disston is analogous to the subject patent and should have been considered by the Patent Examiner. Since plaintiff does not dispute this art as to priority, there is no question as to its predating the subject invention.[10]

Plaintiff's Model 8184 was introduced to the public in the fall of 1971 at the annual trade show. We are told, and have no reason to question, that 38,279 of these hedge trimmers were sold the first year (1972) resulting in gross sales of $1,204,-438.00.[11] Since the device was put on the market 215,410 have been sold for a total sales figure of $6,371,001.00.[12]

This litigation produced a substantial amount of expert testimony. While we do not feel it is necessary to recount the views of each expert it is imperative for later discussion that we briefly outline their credentials.

Black and Decker called Mr. Don A. Fischer, a former dean of the School of Engineering at Washington University in St. Louis, Missouri. Fischer is also a patent attorney (no longer practicing) who describes himself presently as a consulting engineer. He has extensive experience as an "expert" witness in litigation involving engineering principles.[13]

Via deposition testimony Disston examined Messrs. Weber and Pugh, the recognized inventors of the Model 8184. Weber owns a degree in mechanical engineering and was the project engineer for the development of the Model 8184. Pugh, Weber's assistant, also received a degree in mechanical engineering.[14]

Also by deposition defendant examined Russell Fritts, Black and Decker's chief industrial designer who was responsible for the 8184's appearance, and his assistant, Gary Jaffae. Fritts and Jaffae both have degrees in industrial design.[15]

Mr. Stephen Sorak, Jr. (Director of Manufacturing for International Component Corporation), Mr. John E. Jones (Director of Engineering—Disston Corporation) and C. Joshua Abend (industrial design consultant), also called by defendant, all own degrees in fields of engineering or design.[16]

In rebuttal Black and Decker questioned, in addition to some of the witnesses heretofore mentioned, James E. Edgell, a Disston engineer who developed some of the alleged infringing devices, and Burton P. Franklin, President of Engineering for Industry, Inc. The Court finds that these men too have similar educational backgrounds, extensive experience, and are of course quite familiar

8. *See* References cited in File Wrapper History of the '194 Patent. PX No. 4.

9. *Id.*

10. At trial plaintiff raised a question concerning the *prior* existence of the Sony Model TC-110 tape recorder (DX No. 45). To verify this existence Mr. Richard Multer, an attorney with the law firm representing Disston, was called to prove ownership and date of purchase. (*See* Tr. 205–14.) Accordingly we find that this exhibit constitutes art which preceded the asserted invention. In basing our finding on such testimony we perceive no impropriety, *see Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corpora-*

*tion, Inc.*, 546 F.2d 530 (3 Cir. 1976) since Multer was not called as an expert.

11. PX No. 73; Tr. 399–400.

12. PX No. 73; Tr. 399.

13. Tr. 13–17.

14. While the background portions of their respective depositions were not read into the trial record these facts are a matter of court record. Weber Dep. 3; Pugh Dep. 4.

15. Tr. 131–32; 149–50.

16. Tr. 173; 267–68; 356–58.

with power tool construction and mechanics.[17]

The record clearly reveals that one working or knowledgeable in the field of electric power tools would normally be an industrial engineer and/or designer. While we do not believe a college engineering or design degree would be absolutely essential such a person would have to be, either through formal education, reasonable working experience, training and/or a combination of the above, quite conversant with mechanical and electrical engineering principles, battery systems, motors, drive train design, output means, design configuration, aesthetics, model making, and manufacturing processes.

## DISCUSSION

Certain fundamental legal principles are not here subject to question and can be stated in summary fashion.

The Court has jurisdiction over the subject matter and parties involved with this litigation. Venue is proper in this action.

■ The patent in question enjoys a presumption of validity, 35 U.S.C. § 282 (1970 Ed. Supp. V 1975), and defendant has the heavy burden of overcoming that presumption. *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 461 F.2d 66 (3 Cir. 1972); *Jones Knitting Corp. v. Morgan*, 361 F.2d 451 (3 Cir. 1966). The presumption is materially weakened, however, when it is shown that relevant prior art was not considered by the Patent Office. *Allegheny Drop Forge Co. v. Portec, Inc.*, 541 F.2d 383, 384 n. 3 (3 Cir. 1976); *Layne-New York Co., Inc. v. Allied Asphalt Co., Inc.*, 501 F.2d 405 (3 Cir. 1974), *cert. denied*, 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975); *U. S. Expansion Bolt Co. v. Jordan Industries, Inc.*, 488 F.2d 566 (3 Cir. 1973).

■ Of course, no claim for infringement can be based on an invalid patent. *Cridlebaugh v. Rudolph*, 131 F.2d 795 (3 Cir. 1942); *Chisholm-Ryder Co., Inc. v. Lewis Manufacturing Co., Inc.*, 398 F.Supp. 1287

(W.D.Pa.1975), *aff'd*, 547 F.2d 1159 (3 Cir. 1977) (table).

Disston predicates its case for the most part on Section 103 of the Patent Act which reads:

*Conditions for patentability; non-obvious subject matter*

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, *if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.* Patentability shall not be negatived by the manner in which the invention was made. (Emphasis added.)

Defendant contends that the prior art relevant to plaintiff's '194 Patent and Model 8184 hedge trimmer demonstrates "obviousness" under § 103; hence, Claims 1 and 3 are invalid.

■ In determining the issue of obviousness we are to be guided by the three-pronged standard enunciated in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). There the Supreme Court instructed at 17:

Under § 103, [1] the scope and content of the prior art are to be determined; [2] differences between the prior art and the claims at issue are to be ascertained; and [3] the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

That case also permits the Court to consider secondary factors which may aid in making the obviousness or nonobviousness determination. *Id.* at 17–18, 86 S.Ct. 684. We now turn to a discussion of these factors in light of the evidence.

*1. Scope and Content of Prior Art*

At the outset we observe that Black and Decker contends that much of the prior art

17. Tr. 407–09, Edgell Dep. 3; Tr. 417–19.

cited by Disston is not here relevant because it does not derive from, or pertain to, outdoor power tools. We reject this contention because the pertinent art, in our view, should not be so narrowly circumscribed.

It is clear that Black and Decker is not contending that this patent was granted for the invention of cordless electric hedge trimmers. Rather plaintiff contends that its patent "covers a *new construction* for a cordless electric hedge trimmer product. . . ."[18] (Emphasis added.) We have before us then an improvement patent which seeks only to make hedge trimming easier and more efficient; and, in doing so, it embodied certain principles which are not endemic to hedge trimmers. Accordingly, it is not difficult for the Court to believe that *cordless devices* more appropriately delineate the relevant art.

Our belief is supported by a 1963 trade publication which includes hedge trimmers with a variety of appliances introduced to the cordless field.[19] Also, not only did the Patent Examiner cite dissimilar examples of prior art—e. g., patents disclosing cordless electric toothbrushes and an electric knife[20]—, he was referred by *plaintiff's* patent counsel to other patents disclosing items of a non-similar nature (pistols and electric shaver)[21]. By so ruling we perforce reject the testimony of plaintiff's experts which supports a contrary conclusion and accept the testimony of defendant's experts.

### 2. Differences Between Prior Art and Asserted Claims

Keeping in mind that Claim 3 discloses only a battery contained power unit we shall concentrate on Claim 1 and, in doing so, break it down into four segments (A–D) to foster full understanding of how plaintiff's claim measures up against the prior art. Claim 1 begins:

#### Segment A

A power operated shrub or hedge trimmer comprising a housing having an electric motor disposed in the forward end thereof, a blade assembly extending forwardly from the lower end of said housing and driven by said motor through a transmission below said motor,

it continues—

#### Segment B

said housing having a *lower, rearward part cut away to form an outwardly opening recess, an electric power unit constructed to slidably fit within said recess* and having such an external configuration that when it is fully within the recess its *external walls form continuations of the external walls of said housing adjacent said recess,* (Emphasis. added.)

the claim continues—

#### Segment C

cooperating electrical connector means on said power unit and said housing for electrically powering said motor when said power unit is fully in place within said housing,

and ends—

#### Segment D

a transverse recess in the upper rearward part of said housing, forming above it a first handle extending longitudinally of said housing, to be grasped by one hand of a user, and a second handle positioned forwardly of said recess and being inverted U-shaped in configuration whereby its cross piece is above said housing to be grasped by the other hand of said user, said motor, said transmission, and said power unit being disposed for good balance of said tool when handled by said user.

After carefully studying all of the evidence the Court is convinced that the key to plaintiff's claim lies in Segment B. Because it deserves extended discussion we shall treat it last.

Patent No. 3,623,223 [22] (Edgell patent) owned by Disston discloses a cordless elec-

---

**18.** Plaintiff's Post-Trial Brief at 1.

**19.** DX No. 49.

**20.** *See* PX No. 4.

**21.** *Id.*

**22.** DX No. 1, tab 13.

tric grass shear (EGS–1, DX No. 18) which possesses the following characteristics:

a) housing with electric motor in forward end;

b) blade assembly extending forwardly from lower end of housing which is motor driven through transmission below said motor;

c) battery power unit in lower rearward portion of said housing;

d) electrical connector means on power unit for powering the motor which power unit is in place;

e) transverse recess in upper rearward part of housing forming above it a handle which extends longitudinally of the housing; and

f) a control switch on the handle.

These features are called for in Segments A, C, and part of D of Claim 1. Moreover, Black and Decker knew of the Edgell Patent and its disclosed product prior to processing the application for the patent in suit.[23]

As for the remaining portion of Segment D, the Disston CEHT–1 hedge trimmer (PX No. 74) has an inverted second handle positioned forwardly of the unit and, being U-shaped in configuration, its crosspiece above the housing is to be grasped by one hand of the user as called for in Segment D. No prior art considered by the Patent Examiner discloses a hedge trimmer having such a handle. Although the Court does not believe plaintiff is seriously contending that any of defendant's products infringe this handle claim, we note nonetheless that Weber was well aware of the prior use of such handles and knew that they were required on hedge trimmers by Underwriters' Laboratories.[24]

Which brings us to the real change this patent brought to cordless electric hedge trimmers as noted in Segment B. Much of what is disclosed in Claim 1 is covered by the Riley Patent (DX No. 1, tab 5) which gave us the first cordless electric hedge trimmer. As Don A. Fischer, the only witness called for plaintiff's case in chief, testified on cross-examination:

Q Now, do you agree that Weber and Pugh, the Black and Decker inventors named in the patent in suit, did not invent the first cordless electric hedge trimmer with a removable, rechargeable slide-out battery pack?

\* \* \* \* \* \*

A There was a Riley \* \* \* and that had a—it was a hedge trimmer and battery-operated hedge trimmer, and it had a battery pack that slid out of the handle.

Q Do you think you can answer the question I asked you yes or no?

\* \* \* \* \* \*

A The answer would be yes, that Riley Exhibit . . . . (Tr. 50–51.)

Looking then at claim 1 *in toto* it is clear to us that the deviations stated by the '194 Patent lie within Segment B.

We perceive the inventiveness of Claim 1 to lie in two features—one mechanical, one aesthetic—related to the battery pack or power unit. The mechanical feature pertains to the guideways, located at the lower rearward portion of the housing, which serve to mount or affix the battery pack to the housing of the device. The aesthetic feature comprehends the styling of the device and pertains to blending the battery pack, once mounted, into the contours of the housing so as to give the tool a wholly unified appearance.

The crux of the mechanical feature is that the battery pack is constructed to "slidably fit" within the recess of the housing with the resultant effect of creating a wholly-integrated piece. We believe this mechanical feature is disclosed in prior patents, Nos. 3,062,911 (DX No. 1, tab 3) (temple piece, hearing aid), 3,370,987 (DX No. 1, tab 6) (apparatus cover and battery pack), 3,543,746 (DX No. 1, tab 9) (endoscope—otoscope), 3,605,730 (DX No. 1, tab 11) (improved endoscope) and 3,609,262 (DX No. 1, tab 12) (neck-carried battery pack), none of which were before the Patent Examiner.

**23.** Tr. 101–02.

**24.** Tr. 110.

If the Court had any doubts about the application of these patents to Claim 1 from a prior art standpoint they were quickly dispelled with the physical inspection we made of two exhibits—DX No. 13 (the illumination system housing) and DX No. 14 (the battery pack-grip)—which *slidably fit* together to comprise the otoscope.[25] This feature of the '194 Patent merely adopts a prior method—*i. e.,* flanged guideways tooled to engage reciprocal grooves—used in countless ways for seating a component part within a basic unit. In our estimation that method, although derived from non-hedge trimming devices, can be and was readily adapted to a hedge-trimming device.

Likewise the aesthetic qualities of the Weber-Pugh invention do not appear to be new or unique. The styling feature is disclosed at least in part in all of the above mentioned patents. Moreover, a *fully compatible* configuration is disclosed by Patents No. 3,439,596 (DX No. 1, tab 7) (camera) and 3,537,909 (DX No. 1, tab 8) (battery holder), again none of which were brought to the attention of the Patent Examiner.

We note further that while some of the physical exhibits demonstrate this feature in limited fashion [*e. g.,* the otoscope (DX Nos. 13 and 14) and the Sony TC–40 tape recorder (DX No. 47)], the Sony TC–110 tape recorder (DX No. 45) contains a removable battery pack which *fully conforms* to the configuration of the recorder housing. Thus, it can be said of these prior art examples that, at least in combination, they disclose the following features:

  a) power operated device having *removable battery pack*;

  b) power source constructed to *slidably fit* within a recess in the housing of the device; and

  c) external configuration such that when power source is fully within the recess its *external walls form continuations of the external walls* of the housing adjacent the recess.

We therefore find that the aesthetic characteristics of Claim 1 as stated in Segment B show no material differences when compared with prior art.

In sum we find that the prior art forecloses the asserted innovative differences of Claims 1 and 3. Viewing the prior art as a whole it is clear to the Court that Weber and Pugh did no more than modernize the Riley hedge trimmer. This they accomplished by changing the size and shape of the power unit, relocating it and, with the help of Messrs. Fritts and Jaffae, redesigning the housing and power unit so that the latter could be inserted into the former in a different manner and, once inserted, would be visually compatible with the housing.

Thus, by utilizing established engineering and design principles some of which were no doubt borrowed from Disston, Weber and Pugh did little more than perform cosmetic surgery on the Riley product. This face-lifting process, similar to the kind that occasionally rejuvenates show business careers, resulted in a comparatively marketable product but one which did not significantly improve its predecessors' function—cutting hedges. Utilizing old concepts to fashion something different does not, in our judgment, bring anything new to the art in the context of this case.

As Judge Staley stated so concisely in *Layne-New York Co., Inc. v. Allied Asphalt Co., Inc.,* 501 F.2d 405, 407 (3 Cir. 1974):

> The patented method is merely an obvious combination of old elements * * * Combinations of old elements may be patentable, but we do not believe that the method in question is such a patentable combination. (Citation omitted.)

This point is clearly illustrated in *Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc.,* 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969). There the patent holder sought to improve a radiant-heat burner which was used in conjunction with a standard paving machine to lay asphalt. The burner, which like the machine was patented years before, played a critical role in this type of work because it could soften the asphalt—to enhance spreading, shaping and bonding—without burning the surface. Be-

---

**25.** *See also* DX Nos. 10, 10A (walkie-talkie) and DX No. 47 (tape recorder).

cause the burner had been used primarily for patch work the inventor conceived the idea of locating it on the side of the machine so that the heating element could be used continuously for laying asphalt. This placement, which was the central feature of the patent, was held to be "obvious" notwithstanding the fact that no one in the business had thought of it before. After observing that the patent disclosed a different use for an old element the Court concluded at 62–63, 90 S.Ct. at 309:

> [W]hile the combination of old elements performed a useful function, it added nothing to the nature and quality of the radiant-heat burner already patented. We conclude further that to those skilled in the art the use of the old elements in combination was not an invention by the obvious-nonobvious standard. Use of the radiant-heat burner in this important field marked a successful venture. But as noted, more than that is needed for invention. (Footnote omitted.)

More recently, in a case where the patentee *brilliantly* employed an *old* principle (gravity) to devise a *new* method for flushing dairy barn floors, the Supreme Court astutely labelled such efforts " 'the work of the skillful mechanic, not that of the inventor'. *Hotchkiss v. Greenwood,* 11 How., at 267." *Sakraida v. AG PRO, Inc.,* 425 U.S. 273, 282, 96 S.Ct. 1532, 1537, 48 L.Ed.2d 88 (1976). That description is equally applicable here. We now turn to the matter of whether the changes wrought by the '194 Patent would have been obvious to those skilled in the art.

### Level of Skill in the Art

We realize of course that the Court does not determine obviousness by personal hindsight. However, it is fairly apparent from the record that the subject matter of Claims 1 and 3 would have been obvious in December of 1970 to those possessing ordinary skill in the art.

None of the four principals—Weber, Pugh, Fritts and Jaffae—expressed particular difficulty in making the Model 8184. At one point Weber even stated "[The battery pack] had to hang on something and it was very easy to put in some guides—some tracks in there."[26] As for the aesthetic feature Jaffae testified that "it is just a good design principle to blend all components together into a pleasing unit."[27] The testimony of these *four* men is accorded substantial weight not only because they did the actual work but also because it is consistent with that of Messrs. Jones and Abend, both of whom opined that the prior art, in combination, taught the construction of the subject device.[28] To the extent that plaintiff's expert witnesses, Fischer and Franklin, testified to the contrary we reject such testimony.

### Secondary Considerations

While the factors of commercial success and long felt need are helpful in a close case they cannot stem the tide of obviousness reflected in this record. As stated in *Anderson's-Black Rock, supra,* 396 U.S. at 61, 90 S.Ct. at 308 "those matters 'without invention will not make patentability.' *A. & P. Tea Co. v. Supermarket Corp.,* 340 U.S. 147, 153, 71 S.Ct. 127, 130, 95 L.Ed. 162." *See also U. S. Expansion Bolt Co. v. Jordan Industries, Inc.,* 488 F.2d at 572 (3 Cir. 1973).

We therefore hold that Claims 1 and 3 of the subject patent are invalid for obviousness and judgment shall be granted for defendant.

### Counsel fees

Disston, being the prevailing party in this action, requests an award of attorneys' fees pursuant to 35 U.S.C. § 285. Defendant characterizes the action as exceptional citing the venue changes, protractedness, and last minute trial strategies caused by plaintiff. Because such an award is a matter of discretion, *ADM Corp. v. Speedmaster Packaging Corp.,* 525 F.2d 662,

**26.** Tr. 113.

**27.** Tr. 158–59.

**28.** Tr. 314–15; 367–68.

664 (3 Cir. 1975), and since the Court detects this type of legal byplay on both sides of the counsel table, and for the further reason that plaintiff's efforts while not patentable did serve to improve the products in question, *see Metallurgical Exoproducts Corp. v. Pittsburgh Metals Purifying Co., Inc.,* 393 F.Supp. 1104, 1108 (W.D.Pa.1975), *aff'd* 532 F.2d 747 (3 Cir. 1976), *cert. denied* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976), the request shall be denied.

Findings of fact and conclusions of law have not been separately stated but are included in the body of this opinion as specifically authorized by Rule 52(a) of the Federal Rules of Civil Procedure.