**R. W. SIMS, Trustee, and R. W. Sims Trust**

v.

**MACK TRUCKS, INC.**

Civ. A. No. 75–985.

United States District Court, E. D. Pennsylvania.

Sept. 15, 1978.

John A. Young, Fort Wayne, Ind., Stanley B. Kita, Philadelphia, Pa., John A. Young, Fort Wayne, Ind., for plaintiff.

Jon A. Baughman, Philadelphia, Pa., Bernard & Brown, Washington, D.C., for defendant.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

Plaintiffs, a family trust and its trustee, brought suits for patent infringement and for unfair competition based on defendant's manufacture and sale of chassis for front-discharge concrete mixers. We granted defendant's motion for summary judgment as to the unfair competition claim but denied the motion as to the patent claim, 444 F.Supp. 1277 (E.D.Pa.1978). Three issues were tried before me: the validity of the patent in suit under 35 U.S.C. § 103; infringement of it by the defendant under 35 U.S.C. § 271; and, if there was infringement, whether the willfulness of defendant's conduct calls for increased damages under 35 U.S.C. § 284. I now make the following findings of fact and conclusions of law:

### FINDINGS OF FACT

*I. Background:*

1. The plaintiff R. W. Sims is an individual who is the sole trustee of the plaintiff R. W. Sims Trust, a trust organized under Utah law whose beneficiaries are R. W. Sims, his wife and their four children.

2. The defendant is a corporation which is incorporated in Pennsylvania, has its principal place of business in Pennsylvania and is engaged in the manufacture of trucks.

3. The patent in suit is United States Patent No. 2,859,949, issued on November 11, 1958, to J. Jack Willard for a Forward Discharging Transit Concrete Mixer (the "Willard patent") (Fig. 1).

Fig. 1

4. A self-transit concrete mixer is a truck with facilities for receiving, mixing and transporting concrete and for discharging concrete at the site where it is to be used. The construction disclosed in the Willard patent is a fully operative front-discharge self-transit concrete mixer, although its operation could be and later was improved by altering that structure.

5. R. W. Sims in 1958 designed and constructed a front-discharge self-transit concrete mixer and sought to have it patented. When his counsel's patent search disclosed the Willard patent and he learned that his construction would infringe the Willard patent, he entered into negotiations with the patentee.

6. In order to continue to make, use and sell front-discharge mixers, Sims entered into a licensing agreement under the Willard patent. In 1965 Willard assigned to the plaintiff trust all rights under the Willard patent.

## II. Validity:

### A. The Prior Art

7. In 1955 the prior art of self-transit concrete mixing trucks included a rear-discharge mixer, with a drum on a fixed longitudinal axis inclined upwardly toward the rear. This construction is disclosed in, *inter alia,* United States Patent No. 2,661,935, issued on December 8, 1953, to Carl L. Willard, and United States Patent No. 2,672,-327, issued on March 16, 1954, to John F. Oury (Fig. 2).

Fig. 2

In these trucks the concrete mixing drums are filled with concrete through their rear ends. The drums are rotated in one direction to mix the concrete and in the opposite direction to discharge the concrete through their rear ends.

8. The prior art in 1955 included a separate attachment to a tractor for mixing, transporting and discharging concrete, disclosed in United States Patent No. 2,706,623, issued on April 19, 1955, to Fred J. Styes. In this construction, the concrete is carried in a small mixing drum forward of the tractor connected to it by sidebars. These bars can swing from their point of attachment either to extend the mixing drum downward and forward of the tractor for loading or to lift it up, like a car of a ferris wheel, for discharge.

9. The prior art in 1955 included a self-transit concrete mixer which could be loaded from the front of the mixer, disclosed in United States Patent No. 2,327,473, issued on August 24, 1943, to Harold A. Wagner and Gustave H. Wagner. In this construction, a loading device is attached to the truck chassis by arms. When those arms are extended forward, the loading hopper is on the ground and can be loaded. Those arms can be rotated, lifting the hopper over the cab, again like a car of a ferris wheel. When the hopper is over the cab it can be emptied into the front part of the drum. This truck provides for the discharge of concrete through the rear end.

10. The prior art in 1955 included a chute to control the discharge of concrete from self-transit mixers, disclosed in United States Patent No. 2,045,532, issued on June 23, 1936, to John C. Merwin and Charles F. Ball, and in the Oury patent. The Oury cylindrical chute is attached to the side of the mixer for transport and can easily be placed at the discharge end of a mixing truck and positioned so as to control the flow of concrete from the drum to the area where the concrete is to be distributed, while the Merwin chute is a similarly placed open trough.

11. The prior art in 1955 included mechanisms for driving mixing drums on self-transit concrete mixers disclosed in United States Patent No. 2,729,435, issued on January 3, 1956, to Henry C. Harbers and Edward D. Sharpe. These mechanisms are illustrated in the patent by use with a rear-discharge mixer.

12. The prior art mentioned in ¶¶ 6–10, with the exception of the Merwin chute, composed the references cited by the United States Patent Office in the Willard patent file. Of these, only the patent issued to Styes discloses a concrete mixer which discharges concrete in front of the vehicle. The construction in this patent was limited in its use to tractors using small amounts of concrete, however, and was not adaptable to full-sized self-transit concrete mixing trucks.

13. The prior art in 1955 included a concrete mixing drum with helical blades, disclosed in United States Patent Reissue 23,320, reissued on January 2, 1951, to Carl L. Willard and J. Jack Willard. This device is a concrete mixing drum in the shape of a cylinder with a frustum at each end constructed so that the material in the drum is mixed by rotating the drum in one direction and discharged out of one end of the drum by rotating the drum in the other direction.

14. The prior art in 1955 included a rear-discharge concrete mixing truck with a mixing drum which has a non-inclined horizontal axis but which can be inclined in the rear to effect higher discharge, disclosed in United States Patent No. 1,998,749, issued on April 23, 1935, to Charles F. Ball. In this construction the mixing drum did not have a fixed longitudinal axis but rather one which could be varied in order to meet the needs of the discharge on a particular job. This patent was not cited as prior art in the Willard patent.

15. The prior art in 1955 included a concrete mixing truck which discharged concrete out of the front of a cylindrical drum by tilting the drum forwardly and allowing gravity to induce the discharge, disclosed in United States Patent No. 1,509,055, issued on September 16, 1924, to Charles Payne (Fig. 3).

Fig. 3

The construction disclosed in this patent appears to be the only one providing for front discharge of concrete in a full-sized self-transit mixer before the Willard patent. In this construction, the concrete is loaded into the cylindrical drum through the top of the cylindrical drum, which has a non-inclined horizontal axis during the loading and mixing of the concrete. At the time of discharge, the driver in the cab at the forward end of the vehicle operates a lever which causes the rear end of the drum to be raised and the forward end to be lowered, giving the drum an axis upwardly inclined from front to rear and inducing the concrete to slide out the front of the drum, with discharge under the driver's position. The Payne patent provides for discharge into a portable concrete distributing cart, which in turn would be used to apply the concrete. The Payne patent, which was not cited by the United States Patent Office as prior art in the Willard patent, was among the prior art most pertinent to the Willard patent because it embodies a front-discharge self-transit mixer.

16. The prior art included in 1955 self-transit mixers with non-inclined horizontal mixing drums which discharged concrete out the rear ends of the mixing drums by tilting them, much as the Payne patent did in effecting front discharge.

17. Most of the self-transit concrete mixers in use in 1955 were rear-discharge self-transit mixers with drums of fixed axis upwardly inclined toward the rear or discharging end. These trucks had certain disadvantages in their operations. Among these were the slowness of discharging, in that the truck had to be backed up to the point of discharge and the driver often had to leave the cab in order to ascertain where the concrete would be discharged, so that at least two persons were needed to operate the truck when the point of discharge was being varied slightly, one person to drive the truck and the other or others to observe the point of discharge and instruct the driver; and the high rate of accidents caused by the driver's inability to observe the discharging end and chute.

18. There were also in use in 1955 rear-discharge mixers of the type disclosed in the Ball patent which inclined the mixing drum in the rear in order to achieve a high point of discharge, which is advantageous in some situations. These mixers shared the disadvantages of rear-discharge self-transit mixing trucks generally. There were also in use in the 1950's "dumper" self-transit mixers like the construction disclosed in the Payne patent, but they were subject to frequent breakdowns and like rear-discharge mixers with fixed drums required at least two persons, a driver and someone stationed on the ground to operate the separate concrete distributor.

19. The rear-discharge mixers which dominated the self-transit mixer market in the 1950's had their weight concentrated over the rear wheels. This concentration made it difficult and dangerous to discharge concrete into an excavation or on soft ground because the heaviest part of the vehicle had to be near the point of discharge.

### B. Differences Between Prior Art and the Patent In Suit

20. The Willard construction provides for front discharge of concrete by inclining the bowl upward toward the front, rather than rearward as is the case both in the rear-discharge mixer with a drum of fixed longitudinal axis and in the "dumper" mixer of the type disclosed in the Payne patent.

21. The mixing drum employed in the Willard patent is of the type disclosed in United States Patent Reissue 23,320, permitting mixing and discharge by the rotation and counterrotation of helical blades. The shape of the drum is generally similar to those disclosed in the prior art, i. e., a cylinder and a frustum with the cylinder further from the loading and discharging end, but in the Willard construction there is adjacent to the frustum a drum extension, a relatively narrow cylindrical section at the discharging end. This drum extension is somewhat analogous to the narrowed part of the drum at the discharging end of the cylindrical drum in the Payne patent. At the discharging end of the drum extension in the Willard patent there is a discharging chute, similar to those revealed in the prior art, which is supported by a bracket and chain. Like the chute disclosed by the Oury patent, this chute is removed from its discharging position and carried on the side of the unit during transit.

22. As a result of providing for discharge at the front end of the unit, inclining the drum forwardly, providing a drum extension which is elongated and narrowed relative to the frustum adjacent to it and placing a chute extending forward at the point of discharge, the Willard patent permits the point of discharge from the chute to be in the view of the driver of the unit when he is in the cab. Because front discharge is achieved by having the drum discharge above the cab, rather than under it as in the Payne patent, the advantage of high discharge is retained in the Willard construction.

23. The construction disclosed in the Willard patent has a number of advantages over the rear-discharge mixer which dominated the self-transit mixer market as of 1955. Most of these stem from the driver's ability to observe the discharge from the cab and therefore to be able to see the point where concrete is being discharged without leaving the cab. As a result of this visibility, the driver of a Willard unit is able to vary the point of discharge while remaining in the cab. Furthermore, the driver is able to drive forward to the proper point of discharge and bring the point of discharge to it in the first instance without getting out of his cab or relying on other persons' instructions, as is often necessary in rear-discharge mixers where the driver must back into the point of discharge. In addition, the danger that the driver would drive onto a surface which was unable to support the truck or into construction forms without observing the nature of the surface is reduced significantly by the Willard unit. Furthermore, this construction potentially would reduce the high rate of accidents in rear-discharge mixers on account of the full visibility to the driver of the discharging chute and discharge operation.

24. By extending the mixing drum roughly from the rear axle to the forward axle, the Willard construction distributes the weight between the axles more evenly than the rear-discharge mixers in use at the time of its invention.

25. Because the Willard construction distributes the weight of the vehicle more evenly between the front and rear axles and because of the forwardly protruding discharging chute, the Willard vehicle is able to discharge near soft ground or an excavation more safely than a rear-discharge mixer.

26. Relative to the dumper type of self-transit mixer disclosed in the Payne patent, the Willard construction has three types of advantages. First, by incorporating the mixing drum with helical blades which had been developed since the Payne patent and had come to dominate the market by 1955, it incorporates all the advantages of those drums over the more cumbersome and more fragile cylindrical drums and tilting mechanisms of the dumper type of mixer. In addition, the Willard construction permits the driver to see the point of discharge of concrete onto the place where it is being used, with all the advantages which accrue from that visibility, whereas in the Payne patent it is claimed only that the driver is able to observe the discharge into a separate unit used for concrete distribution. The Payne patent does not disclose whether discharge to the point of application itself can be observed by the driver, but its failure to claim that advantage and the placement of the discharging end of the drum relative to the cab make it appear that there would not be such visibility. Finally, the Willard construction maintains the advantages of high discharge, which is impossible in a dumper-type self-transit mixer.

## C. Level of Skill In the Relevant Art

27. There was little evidence presented at trial as to the general level of ordinary skill possessed by those involved in the design of self-transit mixing trucks. The plaintiffs presented evidence through the testimony of R. W. Sims and that of an expert, Robert W. Fay, suggesting that designers of such vehicles were unable to solve the problem of delivering concrete efficiently, quickly and safely and that progress in the industry was through 1955 very slow. The art was characterized by several witnesses as an active one during the early 1950's in spite of the fact that there were no striking advances made. Most of the evidence which related to the level of skill in the art of self-transit mixer design, however, involved only the narrow conclusion that persons of ordinary skill in this art would or would not have perceived the design of the Willard construction as an obvious improvement.

## D. Testimony as to Obviousness

28. Irving M. Fogel, offered by the defendant as a witness on the obviousness of the patent in suit, was in 1955 a civil engineer in the construction business who was a user of concrete. He did not state that he had any familiarity with the art of designing self-transit mixers, other than as a purchaser and repairman of such vehicles, either in 1955 or at any other time.

29. Robert W. Stieg, the defendant's chief engineer in charge of special purpose vehicles, was from 1940 until 1968 employed by a company which manufactured and sold self-transit mixer chassis and was involved in the design of self-transit concrete mixer chassis during those years. He stated that it would have been obvious in 1950 to him, as a designer of such vehicles, to replace the cylindrical drum in the dumper disclosed by the Payne patent with a drum of fixed axis of the type used in rear-discharge mixers at that time. This testimony suggests that the result of that replacement would be the Willard construction. In his discussion of the Payne patent, however, Stieg evidenced an unfamiliarity with that construction as disclosed in the patent. Furthermore, he testified that he was unfamiliar with the problems in the art of self-transit mixer design in the 1950's which the Willard patent addressed and solved.

30. Richard B. Essex, a civil engineer who was from 1933 until 1977 a principal in a company which used self-transit concrete mixers, testified that in 1954 it would have

been obvious to him as a user of self-transit mixers to replace the cylindrical mixing drum on the "dumper" disclosed by the Payne patent with a modern drum of fixed axis, adding a drum extension and chute at the discharging end of the drum, that is, that the Willard construction would have been obvious on the basis of the prior art. Essex was in 1954 familiar with the types of self-transit concrete mixers in use, and he supervised at that time the assembly of self-transit mixers (that is, mounting of mixing drums onto chassis). However, he was not engaged in the design of self-transit mixers then or at any other time (except for consulting as to the design of vehicles, which he did not explain), was not familiar with their design and was unfamiliar with the problems confronting that art in 1954.

31. Walter M. May, who has been an engineer for the defendant since 1939 and is currently executive vice-president of engineering and product, testified that an ordinary civil engineer who was not skilled in the design of self-transit concrete mixers could have made the invention disclosed in the Willard patent on the basis of examining the prior art disclosures of the Payne and Oury patents, and that a mechanic might have been able to come up with the Willard construction.

32. Robert W. Fay, a chemical engineer who has been since 1964 a consultant and executive involved in the engineering and production of front-discharge self-transit concrete mixers, testified that the Willard construction would not have been obvious in 1954 to one skilled in the design of self-transit concrete mixers. Fay was in 1954 not involved in or familiar with the design of these vehicles, but his familiarity beginning in 1964 with vehicles designed in the mid-1950's and his participation in their design beginning at that time have made him familiar with the state of the art in 1955.

### E. Secondary Considerations

33. Since at least the early 1940's there had been a need to develop a self-transit concrete mixer which could deliver concrete more efficiently, quickly and safely than the vehicles which were in use at that time. Throughout the 1940's and early 1950's, the advancements in the art of designing self-transit mixers were few and halting, e. g., improvements to the mixing drums and chutes for discharging concrete, and the principal problems persevered. The front-discharge self-transit mixer disclosed by the Willard patent marked an extremely significant advance in solving these problems. Immediately after its invention in 1955 the Willard construction met with little commercial success. The plaintiff R. W. Sims made improvements on the construction disclosed in the Willard patent in the late 1950's and early 1960's and he organized a corporation which purchased a license under the Willard patent and manufactured front-discharge mixers. Eventually six companies, including every major mixer manufacturer except for the defendant and one other, took licenses under the Willard patent to make, use and sell front-discharge self-transit mixers. These front-discharge mixers, incorporating improvements made by licensees (including R. W. Sims) and others (including the defendant), have enjoyed considerable commercial success from the mid-1960's until the present due to both the advantages disclosed in the Willard construction and those effected by the improvements.

34. The application for the Willard patent was filed on July 18, 1955. On November 14, 1955, Evan S. Pritchard filed an application for a patent relating to a front-discharge self-transit concrete mixer which disclosed a similar construction. In 1958 the plaintiff R. W. Sims began the process which culminated in the design and production of a prototype of a front-discharge self-transit concrete mixer resembling the Willard construction. Sims did not become aware of the efforts of Willard or Pritchard or of the constructions disclosed in these patent applications until he had a patent search conducted.

### F. Combination

35. The component parts of the Willard vehicle do not differ greatly from components of self-transit mixers which already existed in the prior art. This construction

employs a mixing drum already in common use, a chute closely resembling that disclosed in the Merwin patent and a conventional truck chassis and cab. The cylindrical drum extension at the discharging end of the mixing drum in the Willard patent does not conform precisely to anything in the prior art, but it resembles closely the drum extension at the discharging end of the Payne construction both in its general shape (*i. e.,* of reduced diameter relative to the adjacent drum section) and function (*i. e.,* to project the discharge beyond the cab, over it in the Willard construction and under it in the Payne construction). The Willard patent thus represents a rearrangement of elements known in the prior art.

36. Among the effects of this rearrangement of known elements were the visibility of the discharging operation to the driver of the vehicle and more even weight distribution, producing more efficient, faster and safer discharge while retaining the advantages of modern mixing drum operation and of high discharge of concrete afforded by some rear-discharge mixers. These improvements were made possible by the rearrangement of the components disclosed in the Willard patent rather than by the components themselves.

## III. INFRINGEMENT:

37. In 1973 the defendant engineered and began to produce and sell HMM chassis with half-cabs (*i. e.,* cabs occupying only the left half of the front of the vehicle), which were specially designed to accommodate concrete mixing drums which incline forwardly and discharge concrete above the cab and out a chute in front of the cab, in view of the driver.

38. In most instances from 1973 through 1975, the defendant sold HMM chassis only to manufacturers of cement mixing drums and to others, who would mount the drums on the chassis. In some of these cases, the defendant's personnel would work with the purchaser in order to insure that the chassis and drum were properly "mated", that is, that the chassis which was purchased would accommodate the drum properly.

39. In or before January 1977, the defendant sold to purchasers 24 HMM chassis with drums mounted on them and invoiced the purchasers for the price of the entire front-discharge mixer.

40. The defendant at no time manufactured complete front-discharge mixer vehicles consisting of chassis and mixing drums.

41. The defendant advertised to users of self-transit concrete mixers HMM chassis in brochures, in a promotional film and by exhibition in a trade show. The defendant did not limit its marketing effort to licensees under the Willard patent. These promotions mentioned that the defendant manufactured only a chassis which was adapted for use in a front-discharge concrete mixer. The promotional film, exhibition and most of the advertising depicted a complete front-discharge self-transit concrete mixer, however, and much of the defendant's advertising emphasized the advantages inherent in front-discharge mixers rather than in its HMM chassis alone.

42. The HMM chassis is adaptable to other uses besides front-discharge mixers, including rear-discharge concrete mixers, dump trucks and trucks with block haulers and cranes mounted on them. Of sixty-five HMM chassis sold by the defendant as of January 1977, sixty-two were ultimately used for front-discharge mixers, one for a rear-discharge mixer and two for special conveyor bodies.

43. The front-discharge self-transit concrete mixer depicted by the defendant in its advertisements and promotional film ("HMM mixer"), *i. e.,* an HMM chassis and cab with a forward discharging and forwardly inclined mixing bowl mounted upon it, provides for the discharge of concrete in view of the driver by positioning a mixing drum in the shape of a cylinder and frustum and a discharging chute in much the same way as the Willard construction.

44. There are three main differences between the construction disclosed in the Willard patent and the HMM mixer. First, the HMM mixer employs a half-cab, occupying only the left side of the front of the chassis, and the discharging end of the mixer is at

the front of the right side of the vehicle. Consequently, the discharging end of the mixing drum is to the right of and above rather than directly above the cab as it is in the Willard construction. However, the functions of the relative positions of the discharging end of the drum and the cab are identical in the HMM mixer and the Willard construction: to provide high discharge forward of the vehicle in view of the driver. In addition, the discharging chute in the HMM mixer is operated hydraulically whereas the chute in the Willard construction is moved manually. Again, though, the chutes serve the same function in both: the placement of the discharging chute in the HMM mixer is such that the driver can position the means for concrete delivery to a precise point. Third, the HMM mixer does not have a cylindrical drum extension at its discharging end but rather extends the frustum portion of the drum to the front of the chassis. This difference is of little or no practical significance, however, since the structure of the two drums is quite similar and the functions of the elongation of the frustum and the cylindrical drum extension are identical: to bring the discharging end of the forwardly inclined fixed-axis mixing drum above and forward of the cab.

45. The HMM mixer is a combination of a truck chassis; a cab mounted on the front of that chassis providing the driver with forward visibility; bearings behind the cab to support a mixing drum; a mixing drum of fixed longitudinal axis upwardly inclined toward the front with helical blades such that it could discharge by rotating it; a mixing drum composed of a cylindrical portion for mixing and frustum-shaped section forward of that extending in diminished diameter over the cab; means for rotating the drum located on the chassis; and a removable chute for discharging the concrete supported by an arm attached to the chassis.

46. The cab in the HMM mixer is located at least partly under the discharge end of the mixing drum in that it is of lower elevation. The HMM chassis also has a discharge chute supported by a supporting arm mounted on the truck chassis upon which the chute can be swung in and out of the driver's vision.

47. In the HMM mixer most of the engine is directly to the right of the driver's cab, with a smaller part of the engine extending behind and to the right of the cab.

48. In the HMM mixer the driver's cab is centered directly over the front axle.

## IV. INTENTIONAL INFRINGEMENT:

49. The defendant was aware by 1963 of the plaintiffs' rights in the Willard patent and of the plaintiff trustee R. W. Sims' involvement in the production of front-discharge mixers. In that year an officer of the defendant visited R. W. Sims and received information concerning front-discharge mixers. The defendant ultimately decided not to enter into negotiations with the plaintiffs for a license under the Willard patent because it concluded that there was limited sales potential in this market.

50. In 1963 the defendant received from its patent counsel an opinion that the Willard patent would be infringed by virtually any front-discharge mixer with a cab mounted on the front of the chassis. That opinion concerned the scope of the Willard patent only and not its validity.

51. During a survey conducted in 1963, the defendant learned that a prominent manufacturer of self-transit mixers had concluded that the Willard patent was "fully bona fide" after a search by its patent counsel.

52. In late 1972 the defendant was asked by a customer and one of its distributors to produce for them a truck chassis which could accommodate a front-discharge concrete mixing drum. The defendant then conducted a new market study on front-discharge mixers and determined that it would be advantageous to enter this market.

53. During the early part of 1973, while it was engaged in the engineering and development of the HMM chassis and cab, the defendant was aware that production of these units might create liability for infringement by it of the Willard patent. Accordingly, the defendant's new product

committee decided at its January 1973 meeting to proceed with Phase I of the engineering of the HMM chassis (involving modification of an existing chassis) but deferred a decision as to whether to embark on Phase II (design of a complete HMM chassis and cab which would be ready for mounting of a mixer), apparently in light of the patent problem.

54. A memorandum of the defendant dated March 23, 1973, stated that the patent rights to front-discharge mixers had been sold to a company which was experiencing financial difficulty.

55. At the defendant's March 27, 1973 new product committee meeting, a committee member (the defendant's director of marketing product planning) stated that the patent problem was no problem. At that meeting the product committee decided to go ahead with Phase II of the HMM program, involving engineering and release of the chassis. No employee of defendant had any reason at this time to believe that the Willard patent was invalid.

56. At the March 27, 1973 new product committee meeting, the officer of defendant who stated that the patent problem was no problem was advised to get an opinion from the defendant's patent counsel. On April 18, 1973, the defendant's patent counsel stated that manufacture of the HMM chassis and advertisement of its use in a front-discharge mixer would induce infringement of the Willard patent if the total self-transit mixer construction would so infringe. In a letter dated July 5, 1973, that counsel gave similar advice as to liability for inducing infringement by advertising the HMM chassis' use in a front-discharge mixer and suggested that the defendant authorize it to conduct a search into the validity of the Willard patent.

57. In a letter dated June 8, 1973, to one of the defendant's distributors, defendant's director of marketing product planning said that in spite of the patent problem the engineering of the HMM chassis was proceeding unimpeded and that the HMM program was going and would continue to go forward at full speed.

58. Robert W. Stieg, an engineer for the defendant, wrote in an August 7, 1973 memorandum that while the patent validity search was being made the defendant was continuing with Phase II of its engineering for the HMM chassis in order to be prepared to show a front-discharge mixer at its sales meeting in December 1973. Observing that the Willard patent would expire in just over two years, Stieg stated that:

"I would assume the program would be of value even if the patent was proved basic. As I see it, the worst that could occur would be a royalty payment for two years by the party that mounted the front discharge mixer on the chassis."

This evaluation ignored the advice of patent counsel that defendant might be liable for inducing infringement even if it made and sold only chassis if it advertised their use in infringing mixers.

59. Defendant's patent counsel rendered an opinion on August 29, 1973, that the Willard patent was either invalid or should be limited in its coverage so as not to be infringed by the front-discharge mixer employing a half-cab chassis as proposed by the defendant. The defendant's patent counsel's letter of August 29, 1973, invited the defendant to contact it with any questions or comments on its opinion of patent invalidity. Walter M. May, the defendant's vice-president of engineering and a member of the new product committee who claimed he relied on the opinion letter, undertook no analysis of the opinion or further inquiry of counsel. It does not appear that any other employee of the defendant scrutinized that opinion or the references contained therein or contacted counsel.

60. The defendant knew at this time of at least one opinion of counsel engaged by a prominent mixer manufacturer that the Willard patent was valid.

61. When it sought and received the opinion letter from its patent counsel that the Willard patent was invalid, the defendant had already decided to engineer and sell HMM chassis for use in front-discharge self-transit mixers as soon as possible without purchasing a license under the Willard

patent. The determination had been made that the benefits to be derived from marketing the chassis at the earliest practicable time outweighed the costs of a possible infringement suit, in which damages would be borne by the party assembling the entire vehicle and would be limited to royalties for two years. Consequently, there was no reason for the defendant to scrutinize or make inquiries as to the invalidity opinion it received from its counsel; even if it determined that the opinion was incorrect or suspect, it was going to continue with development of the HMM chassis. Thus, the defendant did not rely on the invalidity opinion in deciding to manufacture a chassis specifically designed to accommodate front-discharge mixers.

## DISCUSSION

### I. VALIDITY:

██ As a consequence of the statutory presumption that patents are valid, 35 U.S.C. § 282, defendants who raise the defense of patent invalidity in infringement cases ordinarily bear in this circuit the burden of demonstrating invalidity by "clear and convincing proof." *Tokyo Shibaura Electric Co. Ltd. v. Zenith Radio Corp.,* 548 F.2d 88, 93 (3d Cir. 1977); *Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 461 F.2d 66, 70 (3d Cir.), *cert. denied,* 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972). However, the Willard patent's file history reveals no citation or other evidence of consideration of the Payne patent for a front-discharge mixer.[1] Because I have determined that the prior art disclosed in the Payne patent was highly pertinent to the art patented by Willard, the failure of the Patent Office to consider it greatly weakens the statutory presumption of the validity of the patent. *Aluminum Co. of America v. Amerola Prod-*

*ucts Corp.,* 552 F.2d 1020, 1024–25 (3d Cir. 1977); *U. S. Expansion Bolt Co. v. Jordan Industries, Inc.,* 488 F.2d 566, 569 (3d Cir. 1973); *Phillips Electronic and Pharmaceutical Industries Corp. v. Thermal and Electronics Industries, Inc.,* 450 F.2d 1164, 1176 (3d Cir. 1971). I conclude therefore that the defendant does not bear the burden of demonstrating clear and convincing proof of patent invalidity; rather, the defendant must show by only a small amount more than the preponderance of the evidence that the patent in suit was invalid. Nonetheless, the statutory presumption is not entirely overcome here since the Patent Office did consider a great deal of extremely relevant prior art.[2] Therefore the burden of proof as to patent invalidity, including both the burden of going forward with the evidence and the burden of persuasion, remains on the defendant. *See DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193 at 1200–1201 (3d Cir. 1978).

It is my conclusion that under the *modus procedendi* for establishing patent invalidity on the basis of obviousness, 35 U.S.C. § 103, prescribed by the Supreme Court in *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), and by the Third Circuit in *Systematic Tool & Machine Co. v. Walter Kidde & Co., Inc.,* 555 F.2d 342 (3d Cir. 1977), and *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp., Inc.,* 546 F.2d 530 (3d Cir. 1976), the defendant has failed to make out its defense of patent invalidity. Section 103 provides in part that a patent is invalid

"if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at

---

1. The plaintiffs have argued that several of the sub-classes of patents checked by the Patent Office examiner in connection with the Willard patent contain the Payne patent. Even if inclusion of the Payne patent in these sub-classes would be sufficient to constitute consideration by the Patent Office of it for these purposes, there is no evidence of such inclusion on this record. We must conclude therefore that the Patent Office did not consider the Payne patent in its consideration of Willard's application.

2. Indeed, on one of the defendant's theories of invalidity of the Willard patent, that it would have been obvious to rearrange the components of the rear-discharge mixers in common use at the time of the Willard patent application, the disclosure in the Payne patent is of only marginal relevance compared to the pertinence of the prior art of rear-discharge mixers with mixing drums of fixed axis.

the time the invention was made to a person having ordinary skill in the art to which the said subject matter pertains."

The Supreme Court in *Graham* stated that the ultimate question of obviousness or non-obviousness is a matter of law but added that in § 103 cases three factual determinations must underlie that ultimate resolution: the scope and content of the prior art; the differences between that prior art and the claims of the patent in suit; and the level of ordinary skill in the pertinent art. It added that secondary considerations such as the commercial success of the patented construction and its fulfillment of long felt and unresolved needs might be relevant to the obviousness question. 383 U.S. at 17–18, 86 S.Ct. at 693–694.

There is little room for disagreement as to the scope of the prior art relevant to the Willard patent or the differences between it and the Willard patent. The only significant contention advanced by the defendant as to these factual matters with which I disagree is the suggestion that the Payne patent embodies the primary advantage of the patent in suit: the discharge of concrete in the view of the driver from the truck to the point where it is to be applied, with the greater efficiency and speed stemming from that advantage. It is not clear to what extent the driver of a Payne vehicle would be able to observe from the cab the discharge of concrete and to vary the point of discharge without assistance and without leaving the cab. The description of the Payne patent makes it clear, however, that it does not contemplate the use of the construction disclosed in it in that manner. Rather, the Payne construction is to be used in combination with a portable concrete distributor. The Payne mixer would be able to be driven to the loading point of that portable distributor without the driver having to leave the cab, but the Payne patent contemplates that the concrete be applied to the work area not from the truck but from the portable distributor, which would be transported and operated by other workmen. Hence the advantage disclosed in the Willard patent of a one-person discharging operation was not anticipated by this prior art. This difference between the Payne

disclosure and the Willard patent does not necessarily render the latter's subject matter patentable (*i. e.*, non-obvious), but it is a difference.

For the most part, however, the defendant demonstrated that the prior art included a front-discharge mixer employing an old fashioned cylindrical drum, that rear-discharge mixers operate in much the same way as the construction of the patent in suit and have the same component parts as the patent in suit, and that the crucial difference between the Willard patent and this prior art was the rearrangement of these components and extension of the mixing drum so that concrete would be discharged from the drum at a point above the driver and from the discharging chute at a point forward of the truck and in the vision of the driver.

As to the third factual inquiry mandated by *Graham*, the level of ordinary skill in the pertinent art, the defendant's case was woefully deficient, however. Before ascertaining the level of skill in the pertinent art, a factfinder must determine what the pertinent art is. In denying the defendant's motion for summary judgment on the basis of § 103 invalidity, I determined for purposes of that motion that the hypothetical person skilled in the pertinent art was the designer of self-transit concrete mixing trucks, *i. e.*, "the mechanically skilled individual familiar with the design of devices in the industry", *Systematic Tool & Machine Co. v. Walter Kidde & Co., Inc.*, 555 F.2d at 349 (citations omitted); *see also Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp., Inc.*, 546 F.2d at 537, and I continue to look to that art.

The defendant presented testimony that designers of self-transit mixers in the 1950's had sufficient skill that it would have been obvious to them on the basis of the prior art to produce the Willard construction. Such evidence does not aid me very much in resolving the third factual issue posed by the Supreme Court in *Graham*. The purpose of this inquiry is to discern what the level of skill in the pertinent art was *gener-*

*ally* at the time of invention in order that I be able to determine as a matter of law whether the claims of the Willard patent would have been obvious on the basis of the prior art. Aside from the fact that I consider the testimony presented by the defendant as to the level of skill in this art unreliable because it came from witnesses either interested in the case or unfamiliar with that art, there was insufficient evidence of the general level of skill in that art for me to make meaningful findings of fact.[3] This void in the record represents a deficiency at least as great as that perceived by the Third Circuit on this point in *Universal Athletic Sales Co.* There that court held:

> "The trial judge suggested that the record as to the level of ordinary skill in the pertinent art was 'deficient.' Having so indicated, he should have refused to invalidate the challenged patent claims as obvious."

546 F.2d at 543.

Even reaching the legal question of obviousness in spite of this deficiency as to one of its factual underpinnings, I conclude that the defendant failed to establish that the claims of the Willard patent would have been obvious in 1955 to the designer of self-transit concrete mixers possessed of ordinary skill.[4] The defendant presented three witnesses on the issue of obviousness of the Willard patent. Exercising my broad discretion as to whether to accept expert testimony, *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962), I did not permit the testimony of one of the expert witnesses offered by the defendant, Irving M. Fogel. Fogel was qualified as an expert in the use of concrete, but his expertise in self-transit mixers was limited to his use of them and did not involve any familiarity with the design of such vehicles. Consequently, he demonstrated no qualifications to be an ex-

pert as to the design of such vehicles. *See Universal Athletic Sales Co.*, 546 F.2d at 537.

A second expert witness presented by the defendant, Richard B. Essex, was also qualified primarily as a user of and an expert in concrete and · never designed self-transit mixers or any comparable devices. Essex did state that he had some familiarity with the design of such mixers, however, and so I received his testimony. Essex testified that it would have been obvious in 1954 to him— not to a designer of self-transit mixers—to produce the Willard construction if he were told to produce a vehicle which discharged concrete from its front end. In addition to the fact that this misstates the ultimate question in a § 103 case, which is whether the patented device would have been obvious on the basis of prior art to one of ordinary skill in the pertinent art, I am unwilling to rely on the testimony of an expert who was unfamiliar with the pertinent art and with the art of design generally.

▮ The defendant has argued that the testimony of Fogel ought to have been admitted and that that of Essex should be given controlling weight on the authority of *Systematic Tool & Machine Co. v. Walter Kidde & Co., Inc.*, 555 F.2d at 350 & n. 9. There the Third Circuit, having determined that the person of ordinary skill in the pertinent art was a mechanic familiar with the design of food slicing devices, stated that the controlling evidence as to the ultimate question of obviousness was the expert testimony of a mechanical engineer-designer that the device of the patent in suit would have been obvious to anyone with the skills of an ordinary mechanic or designer. The court held over Judge Rosenn's dissent that this testimony of obviousness to mechanics and designers was *a fortiori* evi-

---

3. The plaintiffs produced some evidence to the effect that designers of self-transit concrete mixers of ordinary skill in the mid-1950's lacked the skill necessary to solve the problems which confronted the art at that time. I do not consider this to be very useful evidence as to the level of ordinary skill in the art generally,

but to the extent it is, it of course militates toward a finding of non-obviousness.

4. Section 103 concerns obviousness "at the time the invention was made." The time of invention of the Willard patent is determined by the date the application for the patent was filed, July 18, 1955.

dence of obviousness to designers of food slicing devices.

I believe that this witness' testimony differed from Essex's in several important respects. The *a fortiori* reasoning in *Systematic Tool* was based on the presumption that food slicing designers possess all the skills of ordinary mechanics and designers, 555 F.2d at 350 n. 9. I am unwilling to presume that the designer of self-transit mixers of ordinary skill possessed in 1954 all of the skills and expertise of Essex, who was an expert in concrete use and user of these vehicles. The relationship presumed by the Third Circuit to exist between mechanics or designers in general and designers of food slicing machines, *i. e.,* that the latter would possess all the skills and knowledge of the former and more, cannot be presumed to exist between users of self-transit mixers with expertise in concrete use and designers of self-transit mixers. Essex's testimony therefore more nearly resembles the testimony of the expert in *Universal Athletic Sales Co.,* 546 F.2d at 537–38, a patent lawyer unskilled in and only slightly familiar with the pertinent art. There the Third Circuit did not invoke the presumption of expertise applied in *Systematic Tool,* and it regarded the expert's testimony as having at best marginal value.

In addition, the expert in *Systematic Tool* testified to a proper obviousness question when he stated that the patent in suit would have been obvious to any mechanic or designer of ordinary skill on the basis of the prior art. On the other hand, Essex testified that it would have occurred to him (not to a person of ordinary skill in any defined art) to construct the vehicle disclosed in the Willard patent if a customer had requested him to build a front-discharge mixer. Thus Essex testified that the patented device would have been obvious once the idea was derived of front discharge employing conventional self-transit mixer components, rather than that the Willard patent in its totality, including that idea, was obvious on the basis of the prior art.

In the final analysis I accept albeit with reservation the applicability of the *Systematic Tool* analysis to Essex's testimony.

But I choose to give very limited weight to that evidence in light of its indirect bearing on the precise issue of whether the Willard patent would have been obvious to a designer of front-discharge mixers in 1955. Unlike the plaintiff in *Systematic Tool,* which allowed the expert testimony of the mechanical engineer to stand uncontradicted, the plaintiffs here offered expert testimony which, while imperfect, was more reliable than that of Essex.

■ Similarly, I am unable to conclude that the patent was invalid on the basis of the testimony of Robert W. Stieg, an employee of the defendant who was involved in the design of self-transit mixers in 1955, that it would have come to his mind immediately in 1950 to construct a front-discharge mixer like that disclosed by Willard on the basis of the prior art. Again, the question of obviousness *vel non* was imprecisely asked. More importantly, I cannot give much weight to this testimony because of Stieg's interest in this litigation as an executive of the defendant, the developer of the HMM chassis and a participant in this litigation throughout its long history. His interest is at least as significant as that of the expert in *Universal Athletic Sales Co.,* who was an associate of the defendant's counsel. There the Third Circuit held it was error for the trial court to place heavy reliance on the testimony of the interested expert, 546 F.2d at 539. For the same reason, the testimony of Walter M. May, an executive vice-president of defendant who studied the front-discharge mixer and contacted the plaintiff R. W. Sims in 1963 and who was involved in the HMM chassis' development, that any civil engineer and "possibly" even a mechanic could have designed the Willard vehicle cannot be relied on. Stieg and May were interested experts by virtue of both their status as executives of the defendant and their personal involvement in this litigation.

I discount on similar grounds the testimony of R. W. Sims, the plaintiff trustee, that the Willard construction was non-obvious on the basis of the prior art. I am persuaded, however, by the testimony of the

plaintiffs' expert, Robert W. Fay, that the Willard patent was not obvious on the basis of the prior art. The greatest flaw in Fay's qualification as an expert is that he was not involved in the design of self-transit mixers until the late 1960's and hence his expertise as to the state of the art in 1955 and what would have been obvious to a person in that art comes from indirect rather than direct experience. Fay did testify, however, that he knew about that art and the skill of persons in it as a result of his involvement in the art some years later and his experience then with the vehicles designed in the 1950's. I do not believe that experience in the pertinent art at the time of invention is the only way one can acquire familiarity with the art at that time sufficient to make him a reliable expert as to obviousness. In fact, Fay was the only disinterested witness who demonstrated knowledge of the level of ordinary skill generally in the art at the relevant time and of the problems confronting that art. Accordingly, Fay was the only expert witness as to obviousness whose testimony merits controlling weight. At the very least, his testimony balances out the weak evidence of obviousness presented by the defendant. Even if I could not deem Fay's testimony controlling, therefore, neither could I rely on the evidence of the defendant, which bore the burden of proof as to a § 103 defense.

The defendant has also suggested that a conclusion of invalidity of the Willard patent based on obviousness is justified on the ground that the factfinder would conclude a reasonable person—i. e., himself—would find it obvious at the time of trial on the basis of the prior art. This approach to a § 103 case seems to me impermissible in that it ignores the mandate of *Graham* that the ultimate § 103 determination cannot be made in a vacuum but rather requires a factual inquiry into the state of the perti-

nent art. Asking the factfinder to look at the patent in suit and determine whether it was or was not obvious without reference to the pertinent art or to time of invention would invite a rough guess as to obviousness, tempting the factfinder to exercise hindsight and read the teachings of the patent in suit into the prior art, *Graham v. John Deere Co.*, 383 U.S. at 36, 86 S.Ct. 684, rather than the careful analysis mandated by the Supreme Court in that case. In any event, I conclude that the patent in suit is not and was not in 1955 obvious to the reasonable person.

■ The Court recognized in *Graham* that so-called "secondary considerations" might be probative of the obviousness of the patent. The following secondary considerations weigh on the side of non-obviousness in this case: (1) the Willard construction, as improved by various licensees under the patent, enjoyed beginning in the mid-1960's considerable commercial success;[5] (2) the gains in speed, efficiency and safety in the operation of self-transit concrete mixers made possible under the Willard patent fulfilled a long-felt need in the industry; and (3) the HMM chassis is a close imitation of the Willard construction based on samples obtained from licensees under the Willard patent and does not resemble closely any of the prior art. The last element, imitation of the patented construction by an infringer who relies on an obviousness defense, has not been recognized as a secondary consideration in this circuit, but it has been so considered by the Second Circuit, *Shaw v. E. B. & A. C. Whiting Co.*, 417 F.2d 1097, 1106 (2d Cir. 1969), *cert. denied*, 397 U.S. 1076, 90 S.Ct. 1518, 25 L.Ed.2d 811 (1970), *quoting Kurtz v. Belle Hat Lining Co.*, 280 F. 277, 281 (2d Cir. 1922), and its status as an indicium of non-obviousness does not appear to have been rejected by any court.

---

**5.** The significance of commercial success as evidence of non-obviousness in this case is diminished by the fact that commercial success came only after improvements were made to the construction disclosed in the Willard patent and depended in part on those improvements. Where commercial acceptance is attributable to properties other than those disclosed in the patent, it does not demonstrate even secondari-

ly non-obviousness. *Douglas v. United States*, 510 F.2d 364, 370, 206 Ct.Cl. 96, *cert. denied*, 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 41 (1975); *U. S. Expansion Bolt Co. v. Jordan Indus., Inc.*, 488 F.2d at 572 n. 13. Here, however, because the rearrangement of mixer components in the Willard patent played a large role in these vehicles' eventual success, this factor is entitled to some weight.

■ The fact that within several years of one another three persons, Willard, Pritchard and Sims, derived virtually the same construction is a secondary characteristic pointing towards obviousness, *Reeves Brothers, Inc. v. U. S. Laminating Corp.,* 417 F.2d 869, 872 (2d Cir. 1969); *Kaz Manufacturing Co., Inc. v. Northern Electric Co.,* 412 F.Supp. 470, 482, 484 (S.D.N.Y.1976). I believe that these secondary factors taken together favor non-obviousness, but in light of the limited weight they are entitled to in this circuit, *Tokyo Shibaura Electric Co. Ltd. v. Zenith Radio Corp.,* 548 F.2d at 94–95, I place little reliance on this conclusion.

The defendant argues that the Willard patent is invalid under § 103 as a combination patent which does not have a synergistic effect, while the plaintiffs have neither disputed nor explicitly agreed with the characterization of the patent in suit as a combination patent. Discounting for the moment the significance of extending the mixing drum at the discharging end, I agree with the defendant and several expert witnesses that the Willard patent is a novel combination of self-transit mixer components revealed in the prior art. Such combination patents are valid only if the familiar elements are put together in a fashion which produces a synergistic effect, "result[ing] in an effect greater than the sum of the several effects [of the components known in the prior art] taken separately." *Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 282, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976), *quoting Anderson's-Black Rock v. Pavement Salvage Co.,* 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969). While the Supreme Court cases do not state clearly the relationship between a synergistic effect and the normal § 103 obviousness inquiry, it appears that at least in this circuit the synergistic effect is but "one factor to consider in determining obviousness," *Sys-tematic Tool & Machine Co. v. Walter Kidde & Co., Inc.,* 555 F.2d at 350.

In any event, I find that the rearrangement of components in the Willard patent produces a marked synergistic effect in that two familiar elements, the mixing drum and the discharging chute, are for the first time place in a fashion such that concrete is discharged in view of the driver sitting in the cab of the vehicle, and less significantly that the drum is arranged to afford more even weight distribution. The Willard patent is not simply the rearrangement of "old elements with each performing the same function it had been known to perform," *Sakraida v. Ag Pro, Inc.,* 425 U.S. at 282, 96 S.Ct. at 1537, *i. e.,* the discharge of concrete from some end of the mixer, but rather a construction in which those elements perform a new and useful function, resulting in greater overall efficiency. The Willard patent deploys these components in a fashion that produces an entirely new result, not merely a "more striking" version of an old one. *Id. Cf. Systematic Tool & Machine Co. v. Walter Kidde & Co., Inc.,* 555 F.2d at 350; *U. S. Expansion Bolt Co. v. Jordan Industries, Inc.,* 488 F.2d at 571–72. While combination patents are as a general matter unlikely to be valid and therefore demand close judicial scrutiny, *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.,* 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950), because the Willard patent produces a synergistic effect it is an exception to this usual rule.[6]

## II. INFRINGEMENT:

There is no doubt that the complete HMM mixer depicted by the defendant in its promotional film and brochures infringes the Willard patent. Every element present in the Willard construction is incorporated into the HMM mixer, with the exceptions that in the latter the cab is directly above rather than forward of the front axle, the major part of the engine is alongside rather

---

6. The analysis mandated by these Supreme Court cases discredits or at least limits the rule that the reversal of familiar components does not produce a patentable device. *See Continental Scale Corp. v. Harrison Wholesale Co.,* 132 F.2d 463, 466-67 (7th Cir. 1942). *See also* *Louis A. Grant, Inc. v. Keibler Indus., Inc.,* 377 F.Supp. 1069, 1083 (N.D.Ind.1973), *appeal dismissed,* 541 F.2d 284 (7th Cir. 1976), in which the court limited the rule to situations in which the reversal produces no new results.

than behind the cab, and the discharge chute is controlled hydraulically. The other differences pointed out by the defendant, the absence of a cylindrical drum extension in the HMM mixer and its use of a half-cab with the discharging end of the mixer not directly above it, do not disturb my conclusion that Willard mixers' and HMM mixers' main components all perform "substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Manufacturing Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950), *quoting Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147 (1929). Thus, even where the HMM mixer did not literally infringe the Willard patent, there is infringement under the doctrine of equivalents set forth in *Graver.* Furthermore, it is clear that the defendant cannot escape liability for infringement by virtue of the fact that its structure represents an improvement over the patented one. *Temco Electric Motor Co. v. Apco Manufacturing Co.,* 275 U.S. 319, 328, 48 S.Ct. 170, 72 L.Ed. 298 (1928); *Ziegler v. Phillips Petroleum Co.,* 483 F.2d 858, 871 (5th Cir.), *cert. denied,* 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973).

Because the defendant was not authorized to make, use or sell this infringing device, any sale or use by it of complete HMM mixers before that patent expired on November 11, 1975, constitutes direct infringement under 35 U.S.C. § 271(a).[7] The defendant is liable for direct infringement by virtue of its use before that date of infringing front-discharge mixers to promote sales of its HMM chassis. There is also evidence on this record, in the form of defendant's answer in January 1977 to an interrogatory, that it sold complete HMM mixers. This evidence does not establish, however, how many if any of those sales occurred before the expiration of the patent on November 11, 1975. The defendant argues that I should find as a result of this lack of specificity that there was no direct infringement. I believe that such a conclusion would be inequitable in light of the bifurcated nature of this proceeding. The trial thus far has determined the issues of patent validity and infringement of the Willard patent by the HMM mixer in the favor of the plaintiffs. In the damages stage, at which time the number of infringements and the reasonable royalty for them will have to be determined, *see Trio Process Corp. v. L. Goldstein's Sons,* 533 F.2d 126, 129–30 (3d Cir. 1976), I will permit the plaintiffs to establish the number of sales (if any) by defendant of complete HMM mixers before November 11, 1975.

The defendant is correct, however, in its contention that on two related grounds the manufacture or sale of an HMM chassis does not make it liable as a direct infringer: the Willard patent is not a patent for a chassis and, as a combination patent, it is protected "only against the operable assembly of the whole and not the manufacture of its parts." *Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 528, 92 S.Ct. 1700, 1707, 32 L.Ed.2d 273 (1972). *See also Aro Manufacturing Co., Inc. v. Convertible Top Replacement Co., Inc.,* 365 U.S. 336, 344, 81 S.Ct. 599, 603, 5 L.Ed.2d 592 (1961).

The defendant asserts that it is not liable for direct infringement in instances of sale or use of complete vehicles where the mixing drum was manufactured by a licensee under the Willard patent. Non-infringement as a result of licensing is, however, a defense to an infringement claim, *Grip Nut Co. v. Sharp,* 124 F.2d 814, 815 (7th Cir. 1941); *Talbot v. Quaker-State Oil Refining Co.,* 104 F.2d 967, 967–68 (3d Cir. 1939), and therefore must be pleaded by the defendant under 35 U.S.C. § 282 and, apparently, F.R.Civ.P. Rule 8(c).[8]

---

7. Section 271(a) provides in part that "whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent."

8. Rule 8(c) requires that affirmative defenses be pleaded. The case law establishes that the existence of a license constitutes a defense to an infringement. Whether it is an affirmative defense is not clear from the cases and moot since § 282 requires pleading of all defenses. The Third Circuit in *Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 461 F.2d at 74, appears to consider all § 282 defenses as affirmative defenses, however.

The defendant did not plead the existence of a license as a defense in its answer and it points to no other pleading of this defense. Rather, it has taken the position that because § 271(a) makes liable as an infringer anyone who makes, uses or sells a patented device "without authority" the showing of non-authority (*i. e.,* non-existence of a license) is an element of the plaintiffs' infringement case. The defendant cites no authority for this proposition, and I have been able to find none. It seems to me a harsh result to hold that the defendant has waived this defense when the record is unequivocal that licenses did exist and that at least some of the defendant's sales and uses incorporated mixing drums made by licensees, but that is the result mandated by § 282 and the Third Circuit's analysis in *Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 461 F.2d at 74.

In determining whether the defendant is liable for inducing infringement under 35 U.S.C. § 271(b),[9] I am faced with a problem analogous to that posed by the direct infringement claim in this case. Because there must be a direct infringement in order for there to be an inducement of it, *Aro Manufacturing Co., Inc. v. Convertible Top Replacement Co., Inc.,* 365 U.S. at 341, 81 S.Ct. at 602, the defendant cannot be liable for inducing infringement in instances where HMM chassis it manufactured and sold were not used to construct infringing front-discharge mixers until after the expiration of the Willard patent on November 11, 1975. Because I cannot yet conclude which HMM chassis sold by defendant were used in front-discharge self-transit concrete mixers which directly infringed the Willard patent (that is, those that were constructed or sold before November 11, 1975), the plaintiffs will have to establish this fact at the damages phase of this proceeding.[10]

■ I conclude that in each instance in which an HMM chassis was used in the construction of a front-discharge mixer, the sale of the HMM chassis by the defendant constituted an inducement of infringement. The statute provides only that active inducement is necessary for § 271(b) liability, and the cases do not shed bright light on what constitutes active inducement. It appears, however, that such inducement requires acts which cause, urge, encourage or aid another to infringe and knowledge by the inducer that infringement is likely. *Fromberg, Inc. v. Thornhill,* 315 F.2d 407, 411 (5th Cir. 1963); *Ingersoll-Rand Co. v. Rockwell International Corp.,* 420 F.Supp. 277, 281 (S.D.Fla.1976); *Burlington Industries, Inc. v. Exxon Corp.,* 379 F.Supp. 754, 757 (D.Md.1974). I conclude that the design and engineering of the HMM chassis for the specific purpose of accommodating front-discharge mixing drums, the solicitation of the HMM chassis depicted as part of a front-discharge mixing unit, the promotion of the advantages of such a unit and the marketing and sales of the HMM chassis constituted inducement of infringement in each instance where an HMM chassis was sold and later used to construct a front-discharge mixer. Clearly, the entire thrust of the development of this product by defendant was to cause and encourage others to produce front-discharge mixers. Just as clearly, these efforts, apparently aimed by defendant toward prospective vendees without discriminating between licensees and non-licensees under the Willard patent, deliberately rather than accidentally caused infringements of the Willard patent, *Fromberg, Inc. v. Thornhill,* 315 F.2d at 411, and were made with knowledge that infringement was likely.

The defendant asserts as it does with respect to the direct infringement claim that it cannot be liable for sales to parties who were licensed under the patent. I must reject that contention for the same reason that bound me with respect to direct infringement: a defense to an infringement claim based upon the existence of a license has been waived as a result of the defendant's failure to plead the defense. I can see

---

**9.** Section 271(b) provides, "Whoever actively induces infringement of a patent shall be liable as an infringer."

**10.** Of course, there is no direct infringement by anyone and hence no inducement of infringement in the cases of HMM chassis used in vehicles other than front-discharge mixers.

**1218**

no way to distinguish for purposes of § 282's broad requirement that defenses be pleaded between licenses as a defense to a direct infringement claim and licenses of vendees as a defense to an inducement of infringement claim. Finally, the authorities advanced by the defendant for the proposition that § 271(b) does not apply to mere solicitation are inapposite since I perceive the defendant's conduct in this case as including solicitation coupled with manufacture and sale (as well as design and engineering) of an infringing product. *See, e. g., Powerlock Floors, Inc. v. Robbins Flooring Co.,* 327 F.Supp. 388, 390 (D.Del.1971), *aff'd per curiam,* 464 F.2d 1022 (3d Cir. 1972); *Hautau v. Kearney & Trecker Corp.,* 179 F.Supp. 490, 492 (E.D.Mich.1959).

■ With regard to contributory infringement pursuant to 35 U.S.C. § 271(c),[11] I conclude that the defendant is not liable because the HMM chassis was a staple article suitable for substantial non-infringing uses. A contributory infringer is one who sells a component of a patented device, as the HMM chassis was with respect to front-discharge mixers infringing the Willard patent, with the conjunctive requirement that the contributory infringer know (1) that the component is made especially for an infringing use and (2) that the component is not a staple article of commerce suitable for any substantial non-infringing use. The evidence is clear that the defendant designed, engineered and made the HMM chassis by adapting another chassis particularly for use in front-discharge self-transit mixers, satisfying the first branch of § 271.

■ Whether the HMM chassis was suitable for substantial non-infringing use is a close question. This is neither a case in which the component manufactured by the defendant can be flatly stated to have been a staple article of commerce suitable for substantial non-infringing use, *see Eversharp, Inc. v. Philip Morris, Inc.,* 256 F.Supp. 778, 781, 786 (E.D.Va.1966), *aff'd per curiam,* 374 F.2d 511 (4th Cir. 1970); *Haskell v. Lever Brothers Co.,* 243 F.Supp. 601, 607, 614 (S.D.N.Y.1965), nor one in which the non-infringing uses have been shown to be a "mere theoretical capability," *Fromberg, Inc. v. Thornhill,* 315 F.2d at 415, or to be dangerous and significantly less suitable uses of the component part, *see Bliss & Laughlin Industries, Inc. v. Bil-Jax, Inc.,* 356 F.Supp. 577, 581 (N.D.Ohio 1972). Here the defendant established that the HMM chassis could be used in a number of types of non-infringing vehicles. There is no evidence on the record that any or all of these uses were merely theoretical or that the HMM chassis would not be efficient or safe in these usages. The record reflects further that three of the first sixty-five HMM chassis sold were incorporated into structures other than front-discharge mixers.

While this hardly makes an overwhelming case for substantiality of non-infringing use, neither have the plaintiffs made the case that the HMM chassis was not suitable for substantial non-infringing use, and the burden is on them to make out this element of § 271(c) liability. Were I to conclude the HMM chassis was not suitable for substantial non-infringing use, I would be doing so primarily on the basis of the fact that this component was especially adapted for the infringing use. That analysis would render the conjunctive of § 271 a nullity.[12]

11. Section 271(c) provides:
  "Whoever sells a component of a patented machine, manufacture, combination or composition . . . constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an *infringement of such a patent, and not a* staple article or commodity of commerce suitable for substantial non-infringing use, shall be liable as a contributory infringer."

12. Nor do I conclude that the plaintiffs have made out a case that the HMM chassis was not a "staple article or commodity of commerce." *See Bliss v. Laughlin Indus., Inc. v. Bil-Jax, Inc.,* 356 F.Supp. at 581, where the court determined on the basis of the dictionary definition of staple that this language imposes a requirement that the component parts be produced regularly or in large quantities. The plaintiffs have produced insufficient evidence for me to make the legal conclusion that the HMM chassis was not a staple commodity.

## III. INTENTIONAL INFRINGEMENT:

Under 35 U.S.C. § 284 I am authorized to increase the damages assessed against the infringing defendant by up to three times the amount which would compensate the plaintiff for the infringement. The plaintiffs seek treble damages on the ground that the defendant's infringement of the Willard patent was knowing, deliberate, wanton and willful. A finding of such conduct on the part of the defendant places the increasing of damages within my discretion. *Blake v. Bassick Co.,* 392 F.2d 879, 883 (7th Cir.), *cert. denied,* 393 U.S. 828, 89 S.Ct. 94, 21 L.Ed.2d 100 (1968); *Jenn-Air Corp. v. Penn Ventilator Co., Inc.,* 394 F.Supp. 665, 676 (E.D.Pa.1975). *See also Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 533 F.2d at 131.[13] Increased damages are to be awarded sparingly and only in cases where deliberate disregard of patent rights has been shown clearly, *American Safety Table Co. v. Schreiber,* 415 F.2d 373, 378 (2d Cir. 1969), *cert. denied,* 396 U.S. 1038, 90 S.Ct. 683, 24 L.Ed.2d 682 (1970).

Obviously, the defendant's infringement of the Willard patent was in no sense accidental or inadvertent. The defendant had known of the existence of the Willard patent and of the plaintiffs' ownership of the rights embodied in that patent since 1963. When it decided to study, design, engineer, produce, market and sell a chassis adapted for use in a front-discharge mixer, the defendant was aware of the possibility that its conduct would make it liable for the infringement of the Willard patent. In disputing that any infringement by it was wanton and willful, the defendant places principal reliance on its consultation of patent counsel, its receipt of an opinion letter

dated August 29, 1973, in which that counsel stated that the Willard patent was invalid, and its alleged reliance on that letter.

■ The defendant is correct in asserting that it can demonstrate its good faith, precluding the trebling of damages on the basis of wanton and willful infringement, by showing that it reasonably relied on the advice of its patent counsel that the patent in suit was invalid. *See, e. g., Union Carbide Corp. v. Graver Tank & Manufacturing Co., Inc.,* 282 F.2d 653, 660 (7th Cir. 1960); *Besly-Welles Corp. v. Balax, Inc.,* 291 F.Supp. 328, 344 (E.D.Wis.1968), *aff'd in part, rev'd in part on other grounds sub nom. Bendix Corp. v. Balax, Inc.,* 421 F.2d 809 (7th Cir.), *cert. denied,* 399 U.S. 911, 90 S.Ct. 2203, 26 L.Ed.2d 562 (1970); *Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp.,* 218 F.Supp. 1, 57 (D.Md.1963), *aff'd per curiam,* 327 F.2d 497 (4th Cir.), *cert. denied,* 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed.2d 36 (1964); *University of Illinois Foundation v. Block Drug Co.,* 133 F.Supp. 580, 591 (E.D.Ill.1955), *aff'd,* 241 F.2d 6 (7th Cir.), *cert. denied,* 354 U.S. 922, 77 S.Ct. 1382, 1 L.Ed.2d 1437 (1957). The thrust of these cases, however, is that good faith can be made out if the infringer demonstrates reasonable reliance on the advice of counsel—that is, that it justifiably believed the advice of invalidity and that it would not have infringed the patent were it not for the inaccurate opinion of its counsel. An infringer's consultation of patent counsel, solicitation of a validity opinion and receipt of an opinion of invalidity do not by themselves preclude a finding of wanton and willful infringement justifying increased damages. *Duplate Corp. v. Triplex Safety Glass Co. of North America,* 81 F.2d 352,

---

**13.** The defendant asserts that the issue of wanton and willful infringement is not properly before me on the ground that such infringement was not pleaded. However, the amended complaint alleges in Count Two (the unfair competition claim, as to which I granted the defendant's motion for summary judgment) facts amounting to willful and wanton patent infringement and in its prayer seeks the trebling of damages. This amounts to a sufficient pleading of intentional infringement, *Copease Mfg. Co. v. American Photocopy Equip. Co.,* 298 F.2d 772, 783 (7th Cir. 1961), in light of the

absence of any requirement in § 282 or elsewhere that reliance on § 284 for increased damages must be specifically pleaded by a plaintiff. While some courts have reserved until after damages have been calculated judgment as to whether they should be increased under § 284, *e. g., W. L. Gore & Assocs., Inc. v. Carlisle Corp.,* 381 F.Supp. 680, 694 (D.Del.1974), *aff'd in part, rev'd in part on other grounds,* 529 F.2d 614 (3d Cir. 1976), I see no reason to delay my decision in that this issue has been fully tried and briefed and neither party has requested that its resolution be stayed.

354 (3d Cir. 1935), *modified on other grounds,* 298 U.S. 448, 56 S.Ct. 792, 80 L.Ed. 1274 (1936); *W. L. Gore & Associates, Inc. v. Carlisle Corp.,* 381 F.Supp. 680, 694 (D.Del.1974), *aff'd in part, rev'd in part on other grounds,* 529 F.2d 614 (3d Cir. 1976); *Hartford National Bank and Trust Co. v. E. F. Drew & Co.* 188 F.Supp. 353, 361 n.41 (D.Del.1960), *aff'd per curiam,* 290 F.2d 589 (3d Cir.), *cert. denied,* 368 U.S. 825, 82 S.Ct. 45, 7 L.Ed.2d 29 (1961).

■■■ I find that the defendant had already decided, without regard for the validity of the Willard patent, to market the HMM chassis without becoming a licensee at the time it sought and received the August 29, 1973 opinion letter. *See McCulloch Motors Corp. v. Oregon Saw Chain Corp.,* 245 F.Supp. 851, 855 (S.D.Cal.1965), where the court found the defendant "had already 'aggressively' proceeded to the design and manufacture of, and to the plans for active distribution of" the infringing product at the time it requested an opinion from counsel and concluded, on that and other grounds, that the infringement was intentional for § 284 purposes. I will summarize only briefly the evidence pointing to this conclusion here: (1) the great expenditure of resources in the development of the product before patent counsel was asked about validity; (2) the fact that it was counsel, and not the defendant itself, that suggested a validity search be undertaken after it had concluded that the defendant's proposed conduct would make it liable as an inducer; (3) the assurances by an executive of defendant that the patent problem was not a problem before any opinion as to the invalidity of the Willard patent existed; (4) the statement in August 1973 of another executive of the defendant that because the Willard patent would expire in 1975 the marketing of the HMM chassis would be beneficial even if the Willard patent were valid and infringed by the HMM mixer; (5) the failure of the defendant to demonstrate that the final decision of its new product committee to produce the HMM chassis was delayed because it was waiting for a validity opinion or was based on the receipt of the August 29, 1973 letter, and the letter to a distributor stating the contrary; and (6) the apparent failure of May or any other employee of defendant involved in this decision to analyze, question or discuss with patent counsel the invalidity decision, although it was known to the defendant that patent counsel retained by another manufacturer had opined that the Willard patent was valid. In light of this evidence, I have concluded that the defendant did not rely on the August 29 letter when it intentionally infringed and induced infringement of the Willard patent, and I will therefore award increased damages. Because the mere existence of counsel's advice of invalidity "may be relevant" to increasing damages, *W. L. Gore & Associates, Inc. v. Carlisle Corp.,* 381 F.Supp. at 694, and the defendant may have relied in some minor degree on this opinion, however, I will hold defendant liable for damages double rather than treble the reasonable royalty necessary to compensate the plaintiffs for the infringement of their rights.[14]

## IV. ATTORNEY FEES:

■■■ The plaintiffs maintain that this is an "exceptional case" within the meaning of 35 U.S.C. § 285, permitting me to award reasonable counsel fees, on the grounds that the defendant had far greater economic resources than the plaintiffs and is guilty of bad faith and fraud in its conduct of this

---

14. The defendant's contention that increased damages cannot be assessed against it relies to a lesser extent on the proposition that such damages are not permitted where the infringer had a colorable belief that the patent was invalid, *Maclaren v. B-I-W Group Inc.,* 401 F.Supp. 283, 304–05 (S.D.N.Y.1975), *rev'd on other grounds,* 535 F.2d 1367 (2d Cir.), *cert. denied,* 429 U.S. 1001, 97 S.Ct. 531, 50 L.Ed.2d 612 (1976). To the extent that this case expands the rule that reasonable reliance on an authoritative opinion of invalidity is necessary to demonstrate good faith and holds that a belief of invalidity appearing in retrospect to have an arguable basis whatever its source and unrelated to the infringer's action is sufficient, I reject its authority. Where, as here, the close issue of validity was of no particular importance to an intentional infringer's state of mind in deciding to infringe, it is also irrelevant to the degree of culpability and to the damage calculation under § 284.

infringement action, in particular because the defense was a "mere mock-up." Only the showing of a losing party's misconduct, e. g., bad faith, fraud, or undue harassment, makes a case "exceptional" in this circuit and allows the prevailing party to be compensated for monies spent in litigating it. *Chemical Construction Corp. v. Jones & Laughlin Steel Corp.,* 311 F.2d 367, 374 (3d Cir. 1962); *W. L. Gore & Associates, Inc. v. Oak Materials Group, Inc.,* 424 F.Supp. 700, 709 (D.Del.1976). While I find that the defendant exercised bad faith in intentionally infringing the Willard patent, I consider the defenses of patent invalidity and non-infringement raised at trial to have been colorable, non-frivolous ones, and I see no proof of bad faith or other misconduct by it in this defense.

## CONCLUSIONS OF LAW

1. This case arises under the patent laws of the United States, Title 35 of the United States Code, and I have jurisdiction over the subject matter pursuant to 28 U.S.C. § 1338(a). I also have jurisdiction over the parties.

2. The date of invention for the Willard patent is its date of filing, July 18, 1955.

3. The presumption of the validity of the Willard patent is weakened by the United States Patent Office's failure to consider and cite the Payne patent, but the defendant continues to bear the burden of proof as to its invalidity defense with respect both to going forward with the evidence and to persuading the factfinder by a preponderance of the evidence.

4. The subject matter disclosed in the Willard patent would not have been obvious in 1955 to a designer of self-transit concrete mixers of ordinary skill on the basis of the prior art, nor would it have been obvious to a reasonable man then or in 1978.

5. The rearrangement of component parts known in the prior art which the Willard patent effects is synergistic in that this combination of elements produces an effect greater than the sum of the effects of the component parts taken separately or arranged in any manner revealed in the prior art.

6. The Willard patent is valid under 35 U.S.C. § 103.

7. The Willard patent is valid under 35 U.S.C. § 112.

8. A front-discharge mixer mounted on an HMM chassis and cab, as depicted by the defendant in its advertising and promotional film, infringes claims 5, 7, 8, 9 and 11 of the Willard patent. That structure does not infringe claims 1, 2 and 4 of the Willard patent.

9. The defendant is liable for direct infringement of the Willard patent under 35 U.S.C. § 271(a) on the basis of any complete front-discharge mixers employing an HMM chassis which it used or sold before November 11, 1975, the date of expiration of the Willard patent.

10. Each manufacture, use or sale by any person before November 11, 1975, of a front-discharge mixer employing an HMM chassis constituted a direct infringement by that person of the Willard patent under 35 U.S.C. § 271(a).

11. The defendant is liable for inducement of infringement of the Willard patent pursuant to 35 U.S.C. § 271(b) in the case of each manufacture, use or sale by another person before November 11, 1975, of a front-discharge mixer employing an HMM chassis sold by it.

12. Manufacture, use or sale of a front-discharge mixer by any person on or after November 11, 1975, does not constitute direct infringement of the Willard patent. In these instances, consequently, the defendant is not liable for inducing infringement pursuant to 35 U.S.C. § 271(b).

13. The HMM chassis was known by the defendant to be especially adapted for use in infringing front-discharge self-transit mixers but was also known by it to be a staple article of commerce suitable for other substantial uses. The defendant consequently is not liable for contributory infringement pursuant to 35 U.S.C. § 271(c).

14. The defendant intentionally and willfully infringed the Willard patent by selling front-discharge mixers, and it intentionally and willfully induced others to in-

**1222**

fringe the Willard patent by manufacturing and selling HMM chassis. The defendant failed to demonstrate good faith and reliance on the opinion of its patent counsel rendered on August 29, 1975, that the Willard patent was invalid. Plaintiffs therefore are entitled pursuant to 35 U.S.C. § 284 to double the compensatory damages to be calculated on the basis of a reasonable royalty for each infringement or inducement of infringement by the defendant.

15. The defenses of invalidity of the Willard patent on the ground of obviousness and of non-infringement were not frivolous, nor was the defendant guilty of bad faith in any other manner in this litigation. The plaintiffs therefore are not entitled to reasonable attorney's fees pursuant to 35 U.S.C. § 285.